**RED SCHOOL HOUSE, INC., et al.,
Plaintiffs,**

v.

**OFFICE OF ECONOMIC OPPOR-
TUNITY et al., Defendants.**

No. 4–73 Civ. 197.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 7, 1973.

Order Oct. 8, 1974.

---

## OPINION AND ORDER

Larry B. Leventhal, Minneapolis, Minn., for plaintiffs Red School House, Inc. and A.I.M. Survival School, Inc.

Thomas E. Dixon, Milwaukee, Wis., for plaintiff Indian Community School of Milwaukee, Inc.

Robert G. Renner, U. S. Atty., by Stephen G. Palmer, Asst. U. S. Atty., Minneapolis, Minn., for defendants.

## OPINION AND ORDER

MILES W. LORD, District Judge.

Plaintiffs Red School House, Inc. (Red School) and A.I.M. Survival School, Inc. (Survival School) commenced this action on April 4, 1973 and immediately moved the Court for a temporary restraining order prohibiting the removal of certain Office of Economic Opportunity (OEO) funds deposited under the name of Upper Midwest American Indian Center, Inc. (UMAIC) at the First Plymouth National Bank. After due consideration, the Court issued such a restraining order and has continued that order in effect pending final adjudication of the matter or further order of the Court. In addition, on May 2, 1973 the Court extended the restraining order to certain other OEO funds deposited

under the name of UMAIC at the Federal Reserve Bank in Minneapolis.

On April 15, 1973, the plaintiffs moved for a preliminary injunction and the Court, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, ruled that the trial on the merits be advanced and consolidated with the hearing on the motion. On April 20, 1973, the Indian Community School of Milwaukee, Inc. (Community School) and the Milwaukee Indian Community Center (Community Center) moved to intervene as plaintiffs, the original parties stipulated to such intervention and the Court granted the motion. Thereafter, on May 8, 1973, when it had become clear that the Community Center did not have a valid claim, the Court permitted its withdrawal as a party upon stipulation of counsel.

Plaintiffs contend that as a result of negotiations commencing in February 1972, OEO agreed to establish and did establish a grant, with UMAIC as grantee, under which each of them was to receive $20,000 for the 1972–73 school year. Plaintiffs further contend that OEO unilaterally suspended such funding on November 17, 1972 and that it has continued to withhold the funding without specifying clear reasons for doing so, without providing the plaintiffs with technical assistance, without exploring the possibilities of reconciliation in good faith, without providing them a hearing and without following various other requirements of its published regulations. In failing to do so, the plaintiffs claim that OEO violated fundamental concepts of due process, the Economic Opportunity Act and its own regulations and that, therefore, its suspension of the grant was unlawful and of no effect.

The defendants contend that the Court lacks subject matter jurisdiction over this action and that, as an unconsented suit against the United States, it is barred by the doctrine of sovereign immunity. The defendants further contend that a grant was never established as to UMAIC or the plaintiffs and that,

even if a grant was established, it was to UMAIC as grantee and, therefore, the plaintiffs need not be granted the hearing and other procedural rights they claim. Finally, they contend that, in any event, certain actions and failures to take certain other actions by plaintiffs justify the suspension and termination of the grant without affording them such rights.

*Findings of Fact*

The Court finds the following to be the pertinent facts:

1. Plaintiffs Red School, Survival School and Community School are independent non-profit corporations which operate schools in St. Paul, Minnesota, Minneapolis, Minnesota and Milwaukee, Wisconsin, respectively. These schools developed out of efforts by the Indian community to meet the unique cultural and educational demands of Indian children, particularly those who have experienced trouble adapting to the public school system. The schools, staffed largely by Indian professional personnel, attempt to develop a close individual relationship between teacher and student and feature curricula reflective of Indian culture and tradition. Such schools perform an important public service in an area where the public schools have often been deficient. The parties stipulated that there is a great community need for this type of school and that the schools operated by plaintiffs were fulfilling this need and providing their students with a good education.

Red School provides both elementary and secondary education and has been in operation since February 1972. At the close of the 1972–73 school year, there were about 40 full time and 25 part time students. Survival School was started in January 1972 and also offers both elementary and secondary education. It had about 55 full time students at the end of the 1972–73 school year. Community School offers the same types of education and was founded in September 1971. At the end of the 1972–73 school

year, 72 students were enrolled in the various courses offered.

The Minneapolis Public Schools have established a relationship with the Survival School whereby the public schools provide hot lunches and certain classroom materials. A similar program is in effect in St. Paul between the St. Paul Public Schools and the Red School, and a program of cooperation has also developed between the Community School and the Milwaukee Public Schools.

The proposed Community Center, unlike the schools, did not predate the grant and was never able to achieve a viable existence because of lack of funds.

■ 2. OEO is an agency of the United States Government, established by Congress in the Economic Opportunity Act of 1964, as amended, 42 U.S.C. § 2701, et seq. The statutory goal of the agency is:

> [T]o eliminate the paradox of poverty . . . by opening to everyone the opportunity for education and training, the opportunity to work, and the opportunity to live in decency and dignity.[1]

OEO is authorized to provide financial assistance to various public and private organizations which it finds will help it meet those goals.[2] This being so, the Court finds that providing funds for schools such as those operated by plaintiffs is well within OEO's statutory authority.

3. Defendant Howard Phillips was appointed Acting Director of OEO on January 31, 1973. Since that date, he has purported to hold such office although his appointment has neither been submitted to nor confirmed by the Senate. However, on June 11, 1973, in Williams v. Phillips, 360 F.Supp. 1363 (D.C. D.C.1973), Judge William B. Jones ruled that Mr. Phillips was holding such office

illegally and ordered him to take no further action as head of OEO. Defendant James W. Griffith was OEO's Chief of Headquarters Operations from January 1972 until April 1973. He is now Acting Associate Director of Indian and Migrant Programs, but has duties very similar to those he performed previously.

4. Beginning in February 1972, Charles Robertson, the administrator of Red School, and others active in the field of Indian alternative education had discussions with various OEO officials concerning possible OEO funding for the community school projects in Minneapolis, St. Paul and Milwaukee and the Proposed Community Center in Milwaukee. Thereafter, representatives of UMAIC had discussions with OEO officials relative to UMAIC serving as the grantee agency for the proposed funding. It was understood that, as the grantee agency, UMAIC would have administrative duties, but the exact nature of such duties was never made clear. Representatives of both UMAIC and the plaintiffs were told by OEO officials that the operation of the grant would be "loose." The total amount of the grant was to be $113,000, with $20,000 to be allotted to each of the plaintiffs and the remaining $53,000 to the Community Center. The grant funds were to be sent to UMAIC by OEO and then distributed to the plaintiffs and the Community Center by UMAIC.

5. Various documents relative to the proposed grant were prepared by OEO and sent to UMAIC for execution. Fredrick Roberts, Chairman of UMAIC's Board of Directors, reviewed and executed the documents on or about March 24, 1972.[3]

6. On June 21, 1972, Mr. Griffith executed the Statement of OEO Grant and Approval.[4] The grant, identified as number 50114, was basically the same as

---

1. 42 U.S.C. § 2701.
2. See, 42 U.S.C. §§ 2781–2837.
3. There was some controversy at trial as to whether some of Mr. Roberts' signatures were forgeries. However, he testified that

he either signed or adopted another's signature as his own on all the documents.

4. This document and the ones referred to above are contained in Plaintiffs' Exhibit No. 1, the grant package.

anticipated and was for the period May 1, 1972 through April 30, 1973. It was directed to UMAIC as the grantee, but was to be "delegated to the three Indian community schools." ·

The grant was effective immediately subject to the right of the Governors of the States to which the funds were ultimately to be sent to veto it and to the right of OEO to amend, modify, reduce or rescind it on or before June 30, 1972 if not satisfied as to initial compliance with specified conditions.[5] Both Governor Wendell Anderson of Minnesota and Governor Patrick Lucy of Wisconsin expressly approved of the grant and conveyed such approval to OEO,[6] and OEO did not purport to amend, modify, reduce or rescind the grant on or before June 30, 1972. Thereafter, any suspension or termination of the grant was to be "in accordance with published regulations." [7]

7. Mr. Griffith repeatedly testified that although he signed the Statement of OEO Grant and Approval, there was never a grant in effect, at least in regard to the plaintiffs, because they had not complied with certain requirements including, but not limited to, the provision of certain financial and accounting data and the execution of a grantee/delegate agency contract. He also asserted that OEO had no obligation to the plaintiffs to follow its regulations dealing with suspension and termination of grants.

Mr. Griffith's view that the grant had never become effective was shared only by Emily Peake, Director of UMAIC since August 29, 1972, who had never seen many of the documents relating to the establishment of the grant. All of the other witnesses, including Robert Howard, Chief of OEO's Indian Programs Branch, conveyed their understanding that a grant had been established. Various letters and telegrams from OEO officials, including Mr. Griffith, indicate that a grant had been established,[8] and a letter from Robert Robertson, Executive Director of the National Council of Indian Opportunity, to OEO shows that he believed that a grant had been made.[9]

8. Pursuant to the apparent grant of $113,000 in all, OEO sent UMAIC $67,800 in September 1972 and $45,000 by letter of credit dated February 12, 1973. UMAIC deposited the first amount in the First Plymouth National Bank and the second amount in the Federal Reserve Bank in Minneapolis.

9. The plaintiffs relied on the grant in formulating their budgets for the 1972–73 school year. In each case, the total amount of income anticipated, including the grant funds, was allotted for the salaries of teachers and administrative personnel, rent, textbooks, educational materials and other school requirements. Based upon their budgets, each of the plaintiffs made commitments by accepting students, hiring personnel, renting space and ordering supplies.

10. On November 17, 1972, before the plaintiffs had received any grant funds, Mr. Griffith notified UMAIC and each of the plaintiffs by telegram [10] that OEO intended to suspend funding under the grant. According to the telegram, suspension was based on a failure by plaintiffs to comply with "OEO regulations, standards, assurances, conditions, grant guidelines, approved work programs, applicable laws, community action memoranda, etc." The telegram indicated that an informal meeting on the situation would be held November 29, 1972.

In a letter of November 20, 1972 to Mr. Griffith, counsel for the plaintiffs and UMAIC stated that the scheduled

5. *See*, Plaintiffs' Exhibit No. 1, Statement of OEO Grant and Special Condition.

6. *See*, Plaintiffs' Exhibit No. 1.

7. *See*, Plaintiffs' Exhibit No. 1, General Condition 14.

8. *See*, Plaintiffs' Exhibits No. 5, 6, 8 and 11 and Government's Exhibit No. 1. *See also*, Plaintiffs' Exhibits No. 2 and 3.

9. Plaintiffs' Exhibit No. 4.

10. Plaintiffs' Exhibit No. 6.

informal meeting was desired and would be attended by representatives of the plaintiffs and UMAIC.[11] They requested that OEO abide by specified regulations relative to providing assistance and guidance in an attempt to remedy by "informal means" any "possible noncompliance." A formal hearing, as provided for by OEO regulations,[12] was demanded "should conciliation efforts not prove satisfactory."

11. The specific reasons for OEO's intention to suspend were set forth in a letter of November 27, 1972 from Mr. Griffith to UMAIC.[13] In the letter, Mr. Griffith cited five reasons for the intended suspension of the grant. However, upon questioning by plaintiffs' counsel at trial as to two of the reasons —"reports of large scale nepotism" and "information [as to employees] of A.I.M. with criminal records"—he could not support them by reference to any specific "reports" or "information." In fact, he was not even sure what nepotism was. Later, when questioned by the Court, Mr. Griffith stated that the only reason for the suspension was the lack of an agreement as to accountability for grant funds between UMAIC and the plaintiffs and the related problems of proper bookkeeping and accounting for expenditures of such funds by the plaintiffs. Therefore, the Court finds that this was the only reason for OEO's purported suspension of the grant.

12. In his letter of November 27th, Mr. Griffith also directed UMAIC to "show cause on December 13, 1972, at 10:30 a. m. before Mr. Robert Howard, Chief of Indian Programs Branch, at the Federal Building, 110 South Fourth Street, Minneapolis, Minnesota, why assistance for operations of centers under OEO Grant No. 50114 should not be suspended." Three representatives of UMAIC and "three representatives designated by the Boards of Directors of the A.I.M. Chapters" were authorized to attend the show cause proceeding. This shows a misunderstanding by OEO that the schools were being operated by certain A.I.M. Chapters which had aided in their development rather than by the independent corporations which were subsequently established. In any event, it is clear that Mr. Griffith's letter served to give notice to the plaintiffs that they would be allowed to participate in the show cause hearing set for December 13th.

For reasons not clear from the record, the December 13th hearing was rescheduled by OEO for December 29th. Plaintiffs continued to demand a hearing and did not agree to the postponement.

13. As a result of the various communications from Mr. Griffith and because they were concerned about the possible costs of the administrative and accounting requirements relative to the grant, UMAIC's Board of Directors requested its accountant, Melvin Goldfein, to prepare an estimate of such costs at its meeting of December 7, 1972. In a letter to the Board of December 12, 1972, Mr. Goldfein estimated that such costs would total approximately $20,-000.[14] UMAIC's Board held a special meeting on December 16, 1972 and voted to withdraw as the grantee, apparently because it felt that the administrative and accounting costs were prohibitively high. That decision was communicated to OEO by telegram the next day.[15]

14. In the meantime, the plaintiffs continued to demand that the promised and often postponed hearing be held. This continuing demand was conveyed in various telephone conversations between representatives of the plaintiffs and various OEO officials. The testimony of Mr. Griffith and Mr. Howard made it clear that they were well aware of the plaintiffs' desire for a hearing.

11. Plaintiffs' Exhibit No. 7.

12. 45 C.F.R. §§ 1010.9(c) and 1010.10 were cited for this proposition.

13. Plaintiffs' Exhibit No. 8.

14. Plaintiffs' Exhibit No. 17.

15. A copy of that telegram is a part of Plaintiffs' Exhibit No. 1.

In addition to demanding that the hearing be held and pursuant to Mr. Griffith's invitation to submit written material,[16] plaintiffs Red School and Survival School sent Mr. Griffith a letter on December 26, 1972 in which they outlined their position on the reasons given by him for the intended suspension and stated that "they were prepared to elaborate in response to [the] enumerated reasons at the forthcoming hearing." [17] Along with the letter, they submitted a number of documents including: a psychological evaluation of school curricula, writings by the students of the schools, letters from public officials including the Mayor of St. Paul and the Lt. Governor of Minnesota, reflective of public support for the schools, a letter from the Minneapolis Public Schools, a television editorial and documents of support from various organizations and individuals.

Mr. Griffith testified that he did not read or respond to any of these materials, and it is unclear whether any OEO official ever examined such materials. In any case, no evaluation or response was made thereto.

15. On December 29, 1972, Mr. Griffith sent UMAIC and the plaintiffs a telegram in which he recognized and concurred in the withdrawal of UMAIC as the grantee and, as a result, suspended the grant "until further notice." [18] He also cancelled the hearing which had last been rescheduled for that date, but indicated that Mr. Howard would meet with UMAIC and the plaintiffs "shortly to explore other avenues for support to the schools."

16. Since his appointment as Acting Director of OEO on January 31, 1973, defendant Howard Phillips and other OEO officials have embarked upon a plan designed to dismantle OEO, transfer some but not all of its programs to other agencies and to abolish OEO itself as an entity by June 30, 1973.[19] The pursuit of this plan by OEO precluded it from focusing its attention on problems relative to some existing programs including the grant involved in this case.

For instance, after Mr. Griffith's purported suspension of the grant and promise that other avenues of support would be explored of December 29th, a meeting which was to have involved various parties interested in lending assistance to the re-establishment of the grant to plaintiffs was scheduled and later cancelled for the week of January 22, 1973.[20] Thereafter, Mr. Howard scheduled a meeting to be held at OEO offices in Washington D. C. on February 7, 1973 concerning the re-establishment of the grant. Arrangements were made for two representatives from each plaintiff, counsel for plaintiffs and representatives of parties who were willing to replace UMAIC as the grantee to attend and be provided government travel vouchers. On February 2nd, the plaintiffs were notified that no travel allowances could be given pursuant to an OEO directive, that as a result of the restructuring and reorganization of OEO, administrative and technical personnel would be unable to attend and that the meeting was therefore postponed until February 21st. Plaintiffs Red School and Survival School wrote to Mr. Phillips on February 15th asking for a confirmation of the February 21st meeting, the availability of travel allowances and the presence of appropriate OEO personnel.[21] However, as in the case of the December 26th letter, no response except a notification that the meeting could not be held, in the words of Mr. Howard, "because of the activities within the agency."

During the trial, Mr. Howard summarized the main reason why the various

16. *See*, Plaintiffs' Exhibit No. 8.

17. Plaintiffs' Exhibit No. 9.

18. Government's Exhibit No. 1.

19. *See*, Plaintiffs' Exhibit No. 12; Local 2677, American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D.C. D.C., 1973).

20. *See*, Plaintiffs' Exhibit No. 11.

21. *See*, Plaintiffs' Exhibit No. 11.

hearings and meetings were never held when he stated that "the changing times, changing scene, the activities within the agency prohibited . . . the people who would be necessary to make the decision that could resolve the grant were not available for the kinds of meetings that we would have to have." It is thus clear that despite its assurances to the plaintiffs to the contrary, OEO did not engage in a good faith effort to find a new grantee or a way to re-establish the grant.

17. Plaintiffs have never received any of the grant funds, and those funds remain on deposit at the First Plymouth National Bank and the Federal Reserve Bank in Minneapolis. However, UMAIC did advance approximately $11,000 to the Red School and $5,500 to the Survival School with the understanding that such amounts would be repaid when those plaintiffs received the grant funds. The exact amount of the funds advanced is not disclosed by the record, but could easily be ascertained from the books of UMAIC, Red School and Survival School. UMAIC also advanced approximately $5,000 for the benefit of the Community School. However, this money was never received by the Community School and was either utilized in planning and developmental work for the proposed Community Center or was misappropriated.

Despite OEO's actions, each of the plaintiffs continued to operate the school program for which OEO had agreed to provide funds during the 1972–73 school year [22] and they did so according to the budgets prepared taking such funds into accounts.[23] In continuing to do so, the plaintiffs relied on OEO's funding commitment.

18. The books and records of each of the plaintiffs have always been available for examination by OEO. However, while it did check as to the existence of the records on several occasions, OEO showed no interest in examining them in any depth prior to the audit carried out at the behest of the Court.[24]

Before OEO indicated its willingness to perform an audit, the Court had requested that UMAIC's accountant, Mr. Goldfein, go over plaintiffs' books with their accountant, Carol Klimmer, in order to determine what amounts were used to meet expenses allowable under the grant and to set up proper accounting systems for the future. Mr. Goldfein and Ms. Klimmer did so, finding that each of the plaintiffs spent considerably in excess of $20,000 for allowable expenses and establishing an accounting system for each plaintiff that includes internal controls which should prove adequate to safeguard any funds they obtain, check the accuracy and reliability of accounting data, promote operating efficiency, and encourage compliance with accepted management policies.[25]

The evidence showed [26] and the Court finds that each of the plaintiffs did spend considerably more than $20,000 on expenses allowable under the grant during the 1972–73 school year. In fact, the Court finds that each plaintiff spent more than $20,000 on salaries for teachers and administrative personnel alone.

19. The Court, while receiving cooperation from the plaintiffs, was surprised and dismayed at the uncooperative and defiant attitude of OEO and its representatives—this constituted the most amazing and unacceptable conduct of an agency of the United States that the Court has observed. On occasion, OEO refused to produce witnesses as ordered by the Court, it failed to produce documents as ordered by the Court after representing that it would do so, it re-

---

22. The school programs for which OEO had agreed to provide funds are set forth in Plaintiffs' Exhibit No. 1.

23. See, Finding of Fact 9 supra.

24. The Report which resulted in this audit is Government's Exhibit No. 5.

25. See, Plaintiffs' Exhibits Nos. 18, 19 and 20, certifications by Mr. Goldfein.

26. Both the testimony of Mr. Goldfein and Ms. Klimmer and OEO's Audit Report (Government's Exhibit No. 5).

sisted all reasonable efforts toward reconciling its differences with the plaintiffs, and certain OEO officials even refused to appear before the Court to attempt to justify such behavior. This conduct, in many circumstances, bordered on the contumacious.[26a]

■ These observations do not apply to the Assistant United States Attorney, who did the best job possible with such a difficult client. In making this observation, furthermore, the Court does not wish to indicate that the government should be penalized for the acts of its agents. But the agents' conduct is relevant to the issue of their good faith and to whether or not their actions were in violation of the law. Surely, if they have no regard for the Court, its orders and its processes, one might assume that their treatment of plaintiffs, who are American Indians, might in some respects fall short.

### Conclusions of Law

■ 1. This matter is properly before the Court pursuant to 28 U.S.C. § 1331 (1970).[27] Defendants' assertion that sovereign immunity bars this suit against OEO and its officers in this case is incorrect because this case falls within one of the well recognized exceptions to the sovereign immunity doctrine. According to Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), the doctrine of sovereign immunity does not apply to "actions by officers beyond their statutory power" or where the powers exercised or "the manner in which they are exercised are constitutionally void." Id. at 622–623, 83 S.Ct. at 1007.[28] Considering the conclusion reached on the merits of this case, this exception deprives OEO and its officers of the sovereign immunity defense. Without it, this case presents a federal question involving the constitutionality and legality of the conduct of federal officials acting under color of federal authority. Section 1331, therefore, is applicable and this Court has jurisdiction to decide the case.

2. The Court finds that it was the intention of OEO, UMAIC and the plaintiffs to enter into a grant relationship wherein UMAIC as the grantee was to receive certain funds from OEO and then disperse such funds to the plaintiffs. This grant was to be for the sole benefit of the plaintiffs (and the Community Center) and was to provide each plaintiff with $20,000 for the 1972–73 school year. The Court further finds that such a grant was actually established, becoming effective upon the execution of the Statement of OEO Grant and Approval by Mr. Griffith on June 21, 1972.

■ The evidence that a grant was actually made by OEO is overwhelming, being established by the testimony of witnesses, the grant package itself,[29] letters from OEO officials referring to the grant and the reliance on the existence of the grant by all parties involved, including OEO, which transmitted grant

---

26a. The attitude of the defendant Office of Economic Opportunity was in sharp contrast to the purposes for which it was created. Loans and grants were to be made to enable needy Indians, among others, to help themselves and provide them with "the opportunity to live in decency and dignity." 42 U.S.C. § 2701 (1970). The attitude of the Office of Economic Opportunity frustrated, circumvented and defeated such efforts. It should be noted the total amount of the grant in question is $60,000 and that the costs of the litigation exceed that by a great deal. Even if it could be said that such action was taken in the name of governmental economy, an accommodation with the plaintiffs would have better served that end.

27. See, e. g., State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973) ; American Federation of Government Employees v. Phillips, 358 F.Supp. 60 (D. D.C.1973) ; Local 2816, Office of Economic Opportunity Employees Union v. Phillips, 360 F.Supp. 1092 (N.D.Ill., 1973) ; Berends v. Butz, 357 F.Supp. 143 (D.Minn., 1973).

28. See also, Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962) ; Larson v. Domestic and Foreign Corporation, 337 U.S. 682, 701–702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

29. Plaintiffs' Exhibit No. 1.

funds to UMAIC both before and after its purported suspension of the grant.

3. In the grant package originally compiled by OEO, UMAIC is referred to as the grantee, and the plaintiffs are referred to as delegate agencies. It appears, as OEO has stated, that UMAIC is in fact a "recipient," 45 C.F.R. § 1067.1–3e (1972), or a "direct recipient," 45 C.F.R. § 1067.1–3f (1972). The designation of plaintiffs as delegate agencies is also consistent with OEO regulations. A "delegate agency" is defined as an entity "to which the development, conduct, or administration of all or part of a project . . . has been delegated by a direct recipient." 45 C.F.R. § 1067.1–3f (1972). At all times relevant to this case, it appears that plaintiffs, UMAIC and OEO considered plaintiffs to be delegate agencies, despite the failure of plaintiffs to execute formal delegate agency contracts. The definition of a delegate agency, furthermore, does not require the existence of such a contract, and the fact that UMAIC was designated a grantee only after most of the details of the grant had been negotiated by plaintiffs and OEO is a convincing indication that plaintiffs were considered delegate agencies within the meaning of OEO regulations.

According to OEO regulations, a "recipient" such as UMAIC appears to be entitled to certain forms of notice and opportunities to be heard by OEO in connection with suspension or termination proceedings. Under many circumstances, agencies receive notice about a proposed OEO suspension or termination from the recipient and do not have procedural rights equivalent to those of a recipient. However, a delegate agency "whose activities or failures to act are a substantial cause of the proposed suspension" [30] is entitled to virtually all the procedural safeguards of a recipient. Plaintiffs were within this category of delegate agencies because it appears that plaintiffs' purported failure to provide certain financial and accounting data and their failure to execute formal delegate agency contracts were the reasons for the proposed suspension.

■ A delegate agency which is in this category has virtually the same rights to notice, statement of reasons, opportunities for informal compliance, right of a hearing and of findings relative to any termination action initiated by OEO as does a "recipient." 45 C.F.R. § 1067.1–4(b)(6) and 45 C.F.R. § 1067.1–8 (1972). Plaintiffs thus have an ascertainable and identifiable interest in the grant and the right to demand that OEO comply with its published regulations.[31]

■ 4. This right coexists with, but is independent of, the rights and desires of UMAIC. Defendants assert that plaintiffs were not entitled to any of the procedural rights provided by the regulations because the grant was ultimately terminated by the withdrawal of UMAIC as grantee, rather than by unilateral OEO action. This contention, however, is not adequately supported by the facts of this case and the applicable regulations. It is true that a month after suspension proceedings were initiated by OEO, UMAIC sought to withdraw as grantee because anticipated administrative costs were thought to be prohibitively high. This withdrawal was communicated to OEO on December 17. When the Court met with the Board of Directors of UMAIC during these pro-

---

30. 45 C.F.R. § 1067.1–4(b)(6) (1972).

31. "Recipient" is defined in the OEO regulation as an entity "which has received assistance" from OEO. 45 C.F.R. § 1067.1–3e (1972). While plaintiffs never actually received any of the grant funds, the grant was established, it was intended that plaintiffs would receive the funds, and grant funds had actually been forwarded to UMAIC for the sole benefit of plaintiffs. Taking these facts into consideration, and in view of the circumstances under which this particular grant was formulated, it is possible to conclude that the grant funds were "received," as that term is used in the definition of recipient, by both UMAIC and the plaintiffs, and that both are "recipients" under the regulations.

ceedings, however, there was confusion and disagreement as to whether UMAIC was still the grantee. This raises doubts as to whether UMAIC properly withdrew as grantee. In addition, even if it did withdraw, such actions should not operate to deprive plaintiffs of the array of procedural rights which OEO regulations provided for them a full month before UMAIC sought withdrawal. Plaintiffs' procedural rights came into existence on November 17, 1972 when Mr. Griffith notified UMAIC and plaintiffs of OEO's intention to suspend the grant. This was well before UMAIC sought to withdraw, and UMAIC's action did not operate to deprive plaintiffs of these rights.

The particular facts of this case also support this view. They indicate that UMAIC was to be a mere conduit of funds for a program which had been worked out between plaintiffs and OEO before UMAIC was sought as the middleman. As delegate agencies whose conduct was responsible for the proposed suspension, and as entities who had initiated and developed the program along with OEO, therefore, they were entitled to all the procedural safeguards enumerated in the OEO regulations. Clearly, the regulation providing an informal meeting was intended to benefit both recipients such as UMAIC and responsible delegate agencies such as plaintiffs by providing them with a forum for resolving the problems which caused the proposed suspension. Given the uncertainties of UMAIC's position, had OEO ever met with the plaintiffs in good faith, it is possible that UMAIC would have resolved its difficulties or that another middleman could have been found. OEO's repeated failure to hold the meeting, however, precluded the possibility

of any resolution of the problem or consideration of alternatives. Their conduct, therefore, was contrary to both the intent and the terms of their regulations.

■ 5. The terms of the grant provide that under certain circumstances unilateral recision or modification of the grant may be made by OEO if such action is taken on or before June 30, 1972. However, if no such action is taken by that date, as was the case here, any suspension or termination must be "in accordance with published regulations." [32] In this case, OEO purported to suspend the grant to the plaintiffs long after June 30, and, therefore, OEO's suspension procedures should have been followed.[33]

The regulations provide both for suspension on notice [34] and for the more abbreviated summary suspension.[35] Mr. Griffith, in his November 27, 1972 letter to UMAIC stated that the suspension procedure was "set forth in Title 45, Chapter X Part 1067, of the Code of Federal Regulations," but did not make it clear which type of suspension was intended. It is clear, however, that a suspension on notice was intended, since Mr. Griffith's telegram of November 17, 1972 spoke of an intention to suspend consistent with suspension on notice and did not impose an immediate suspension.

■ The Court finds that OEO's purported suspension on notice was unlawful because it was not done pursuant to the procedure set forth in 45 C.F.R. § 1067.1–4(b) (1972). For instance, Mr. Griffith's telegram of November 17, 1972, did not specify the grounds for the proposed suspension or state that UMAIC and the plaintiffs had a right to submit written material in opposition to the intended suspension.[36] Mr. Griffith's

32. *See,* Plaintiffs' Exhibit No. 1.

33. A suspension is a temporary curtailment of assistance pending either a resolution of difficulties or the initiation of termination proceedings. See, 45 C.F.R. § 1067.1–3(i), .1–4(b)(12) and (c)(6), and .1–5(a) (1972). Suspension procedures are at 45 C.F.R. § 1067.1–4 (1972).

34. 45 C.F.R. § 1067.1–4(b).

35. 45 C.F.R. § 1067.1–4(c).

36. This was in violation of the requirements of 45 C.F.R. §§ 1067.1–4(b)(2) and (3) (1972).

follow-up letter to UMAIC of November 27, 1972, which the telegram stated would "follow immediately," specified the grounds for the intended suspension and stated that UMAIC had a right to submit written material in opposition. However, this letter was not sent directly to the plaintiffs by Mr. Griffith, as was required by the regulation,[37] and plaintiffs were not properly informed of their right to submit written material.[38] 45 C.F.R. § 1067.1–4(b)(9) (1972) requires, furthermore, that the "responsible OEO official"[39] is to consider the written material and any material submitted at the informal meeting[40] before he or she decides whether or not to suspend the grant. Despite these requirements, Mr. Griffith suspended the grant on December 29, 1972[41] without considering the letter from plaintiffs' counsel of December 26, 1972 and the material enclosed therein[42] and without holding the informal meeting. In sum, the course of conduct followed by Mr. Griffith violated the rights of plaintiffs, as delegate agencies substantially responsible for the proposed suspension, to notice directly from OEO of both the reason for the proposed suspension and the right to submit written material to a disclosure by OEO of plaintiffs' right to an informal meeting, and their right to consideration of the written materials they submit by the responsible OEO official before the decision to suspend is made.

A final instance of OEO's departure from its own procedures is its failure to initiate termination proceedings pursuant to 45 C.F.R. §§ 1067.1–5 through .1–10 (1972) within 21 days of suspension. In fact, termination proceedings were never held. The purported suspension, followed by total inaction, appears to have been an attempt by OEO to effectuate termination without following the required procedures. This course of action. deprived plaintiffs of their right to have such procedures followed.

6. If OEO's written procedures had been followed, the Court could consider the specific findings of fact adduced at the termination hearing and the conclusions drawn therefrom in determining whether there was a basis in fact for the termination. Such a determination, however, is impossible in this case because the required termination procedure has not been followed and no formal findings of fact, conclusions, or reasons for the termination are available for review.

7. This Court in Berends v. Butz, note 27, *supra,* commented at length as to the procedural due process violations inherent in situations where an administrative agency refuses to comply with statutory requirements and with its own administrative regulations. A similar situation is present in the instant case. In *Berends,* the Department of Agriculture attempted to cancel a program of

37. Although Mr. Griffith directed UMAIC to furnish plaintiffs with copies of his letter, this was a violation of the express requirement of 45 C.F.R. § 1067.1–4(b)(3) (1972) if plaintiffs were considered to be recipients or of 45 C.F.R. § 1067.1–4(b)(6) (1972) if plaintiffs were considered to be delegate agencies.

38. Plaintiffs have this right pursuant to 45 C.F.R. §§ 1067.1–4(b)(3) and (6) (1972).

39. The responsible OEO official in this case is Mr. Griffith.

40. 45 C.F.R. § 1067.1–4(b)(9) (1972). Such a meeting was originally set for December 13, 1972, but was postponed by Mr. Griffith several times.

41. See, Government's Exhibit No. 1.

42. Plaintiffs' Exhibit No. 9. Mr. Griffith testified that he received the letter and enclosures, but was unable to recall any details about such material. It appeared to the Court that Mr. Griffith had not even read the material. In any event, it is clear that he did not "consider" the material as required by 45 C.F.R. § 1067.1–4(b)(9) since he testified that the material was referred to Mr. Howard for consideration. Mr. Griffith apparently never got a report back from Mr. Howard on his consideration of the material. Mr. Howard testified that he had received the correspondence about this grant, presumably including the material discussed here, but that he was not familiar with it in detail.

emergency agricultural assistance in violation of statutory directive and agency regulations. Here, as in *Berends*, administrative officials have violated statutory mandates, their own agency's regulations, and showed total disregard for due process in dealing with those to be benefitted under a program of federal assistance. The Court's remarks made at that time are appropriate and applicable herein.

Not only was the administrative action taken in excess of statutory authority, but it also was in violation of the duly promulgated regulations set up by the Department of Agriculture. Validly issued regulations of an administrative agency have the force and effect of statutes. *See,* Sheridan-Wyoming Coal Co. v. Krug, 84 U.S. App.D.C. 288, 172 F.2d 282 (1949). The failure of an administrative agency to follow its own established procedures constitutes a violation of procedural due process. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959); Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). As stated in United States v. Heffner, 420 F.2d 809, 811 (4th Cir. 1970);

An agency of the government must scrupulously observe the rules, regulations or procedures which it has established. When it fails to do so, its actions cannot stand and courts will strike it down. This doctrine was announced in United States ex rel. Accardi v. Shaughnessy, 347 U. S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). There, the Supreme Court vacated the deportation order of the Board of Immigration because the procedure leading to the order did not conform to the relevant regulations. The failure of the Board and of the Department of Justice to follow their own established procedures was held a violation of due

process. The *Accardi* doctrine was subsequently applied by the Supreme Court in Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed. 2d 1403 (1959), and Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). . . .

It is of no significance that the procedures or instructions which the [agency] has established are more generous than the Constitution requires. In Service v. Dulles, *supra*, the Supreme Court vitiated the discharge of a foreign service officer because of the State Department's failure to follow its own procedures. The Court concluded that it made no difference that the State Department had no statutory or constitutional obligation to establish the procedure in question:

While it is, of course, true that . . . the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, . . . having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them. 354 U.S. 388, 77 S.Ct. at 1165.[43]

8. Defendants' cavalier treatment of plaintiffs is strikingly evident in its continued refusal to hold a hearing or engage in a conference relative to the purported suspension and termination. Although such proceedings were scheduled on at least six different occasions, each in turn was unilaterally cancelled by OEO. Even after plaintiffs brought this suit, OEO has been unwilling to justify or even to explain its actions.

9. The course of action embarked upon by OEO commencing in late January 1973 leading to a cancellation and shut-down of many programs of OEO, the transfer of others to other agencies, and a complete termination of OEO as an entity by June 30, 1973, was illegal from its inception as in excess of statutory authority. American Federa-

---

43. Berends v. Butz, *supra* n. 27, at 1185, 1186.

tion of Government Employees v. Phillips, 358 F.Supp. 60 (D.D.C.1973). It appears that the failure of OEO and its officials to give any meaningful attention to plaintiffs' status was a product of the diversion of virtually all efforts of OEO personnel from the administration of current program grants to the termination of grants and the dismemberment of the agency.

10. Plaintiffs, in their respective complaints, requested a sequence of injunctions directed toward preventing defendants from commencing further suspension or termination actions without first complying with the appropriate regulations. The grant year specified within the grant which has been the subject of this litigation has now expired. The Court is aware of no further grant relationship between the parties. Thus, the injunctive relief requested would not serve any purpose nor be appropriate at this time.

11. The requests by plaintiffs that they be awarded reasonable attorney fees and accounting fees for those services utilized in connection with this litigation are deemed by the Court to be appropriate for separate consideration. Accordingly, separate findings shall be issued at a later date.

### ORDER

The Court has determined that a grant of funds to plaintiffs from OEO was actually established and that the efforts by OEO officials to suspend and terminate the grant were in violation of the procedural rights of plaintiffs and of no effect.

Accordingly, it is hereby ordered that:

(1) Plaintiff Red School is awarded judgment against OEO in the amount of $20,000. OEO is directed to pay the Red School said amount forthwith to its attorney, Larry B. Leventhal, or to its administrator, Charles Robertson, or his successor.

(2) Plaintiff Survival School is awarded judgment against OEO in the amount of $20,000. OEO is directed to pay the Survival School said amount forthwith to its attorney, Larry B. Leventhal, or to the Chairperson of its Board of Directors, Mary Jane Anderson, or her successor.

(3) Plaintiff Community School is awarded judgment against OEO in the amount of $20,000. OEO is directed to pay the Community School said amount forthwith to its attorney, Thomas Dixon, or to its school director, Dorothy Ogrowowski, or her successor.

(4) These funds are all to be paid out of the $67,800 on deposit at the First Plymouth National Bank.

(5) Plaintiffs Red School and Survival School, upon receipt of the amounts as specified herein from OEO, shall repay, without interest, the respective loans advanced to them by UMAIC.

(6) Pending the Court's decision as to the plaintiffs' request for an award of attorney fees and accounting fees or other further order of the Court, the remaining grant funds on deposit at the First Plymouth National Bank and at the Minneapolis Federal Reserve Bank shall remain on deposit at said banking institutions; and the restraining order heretofore issued restraining defendants, their agents and those in consort with them from removing or otherwise recommitting such funds, shall remain in effect, except as provided above.

It is so ordered.

### ON MOTION FOR ATTORNEYS' FEES

This action arose out of plaintiffs' allegations that the Office of Economic Opportunity illegally cancelled a grant of funds which were to be used by the plaintiffs in their educational programs. In addition to their claims for relief, plaintiffs moved for attorneys' and accountants' fees and expenses. On November 7, 1973, this Court issued an opinion and order finding that the OEO had illegally terminated the grant, and ordering that the promised $20,000 be paid to each of the three plaintiffs. The source of the funds was money deposited in two bank accounts in Minneapolis

prior to the cancellation by OEO of the grant. The Court had previously ordered the money to remain on account until the termination of this litigation. While the November 7 order was pending on appeal, the motion for attorneys' fees was held in abeyance. Because the appeal taken by defendants has been dismissed, the question of attorneys' fees is now ready for determination.

The plaintiffs in this action are three schools which have been developed by the Indian communities of Minneapolis, St. Paul and Milwaukee to meet the unique cultural and educational needs of Indian children, particularly those who have experienced trouble adapting to the public school system. They offer both elementary and secondary education. For the 1972–73 school year, they were attended by a total of about 200 students. This action was commenced against the Office of Economic Opportunity (OEO) on April 4, 1973. The OEO is an agency of the federal government authorized to provide financial assistance to various public and private organizations which it finds will help meet the goal of eliminating poverty in the United States. Plaintiffs alleged that the OEO was depriving the schools of funds which had previously been granted to them. This Court found that the termination proceedings undertaken by OEO to cut off the grants violated the procedural rights granted to the plaintiffs by OEO regulations for such a termination. Accordingly, it was ordered that the plaintiffs be awarded the funds wrongfully withheld.

The findings of fact and conclusions of law in this Court's opinion of November 7, 1973, so far as they are relevant to the issue of attorneys' and accountants' fees, are adopted and incorporated herein by reference. In determining whether plaintiffs will be entitled to attorneys' fees in this action, additional findings and conclusions must be drawn concerning the appropriateness of awarding attorneys' fees in a case such as this one, and the power of this Court to award attorneys' fees when the de-

fendant is an agency of the federal government.

The Court would have little hesitation in awarding attorneys' fees in this case if the defendant was not an agency of the federal government. This case falls well within the category of cases where the conduct of the defendant, the nature of the plaintiffs and the character of the remedy granted makes the awarding of fees to the prevailing parties appropriate.

In Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), the Supreme Court reaffirmed the power of the federal courts to award attorney's fees to the prevailing party when the interests of justice so require. *Id.* at 4–5, 93 S.Ct. 1943. Of the many traditional grounds which call for the award of attorney's fees, the obdurate conduct of the defendants, indicating bad faith, and the posture of the plaintiffs as private attorneys general combine in this case to give the plaintiffs a strong equitable claim for attorneys' fees and witness fees.

Concerning the conduct of the defendants during the course of this litigation, in its earlier opinion this Court indicated that it was "surprised and dismayed at the uncooperative and defiant attitude of OEO and its representatives." The Court's finding on the OEO's conduct was that it

constituted the most amazing and unacceptable conduct of an agency of the United States that the Court has observed. On occasion, OEO refused to produce witnesses as ordered by the Court, it failed to produce documents as ordered by the Court after representing that it would do so, it resisted all reasonable efforts toward reconciling its differences with the plaintiffs, and certain OEO officials even refused to appear before the Court to attempt to justify such behavior. This conduct, in many circumstances, bordered on the contumacious. *Red School House, Inc., supra* at 1186.

This kind of conduct on behalf of the defendant was not limited to the trial. Before suit was brought, employees of OEO consistently refused to meet with the plaintiffs in an effort to reconcile their differences. An informal meeting originally scheduled by the defendants for November 29, 1972 was postponed many times, often over plaintiffs' objection, until plaintiffs were finally informed in mid-February, 1973, that the meeting would not be held, in the words of one OEO official, "[because] of the activities within the agency." *Id.* at p. 1185.

According to *Hall*, "it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Hall, supra,* 412 U.S. at 5, 93 S.Ct. at 1946 (citation omitted).

This Court is convinced that the defendants in this case have acted in such a way as to satisfy this standard with respect to both the actions that led to this lawsuit and their conduct of this litigation. In the admiralty case of *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88· (1962), for example, attorneys' fees were allowed because the respondent's recalcitrance forced the libellant "to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old." *Id.* at 531, 82 S.Ct. at 999. The laws and regulations involved in this case are not so old, but their direction is clear nonetheless. OEO unilaterally halted its funding commitment to the plaintiff schools, ignored its own regulations in so doing, failed to follow existing statutory directives, and acted in an uncooperative manner before this Court.

The present action, therefore, is clearly analogous to *Vaughan,* with the added element of conduct at trial bordering on the contumacious. Because of defendant's unreasonably defiant conduct, plaintiffs have been forced to hire attorneys and accountants and to engage in this protracted litigation to vindicate rights guaranteed by OEO regulations.

This conduct can certainly be characterized as in bad faith, and thus warrants the award against it of plaintiffs' attorney and expert witness fees.

While the conduct of the defendants is reason enough, standing alone, to justify an awarding of attorneys' and accountants' fees, the posture of plaintiffs as private attorneys general in this case also favors such an award. It is well established that attorneys' fees are appropriate when the attorney "has effectuated a strong Congressional policy which has benefitted a large class of people, and where further the necessity and financial burden of private enforcement are such as to make the award essential." La Raza Unida v. Volpe, 57 F.R. D. 94, 98 (N.D.Cal.1972) (footnote omitted), affirmed, 488 F.2d 559 (9th Cir. 1973), or where the plaintiffs have "served the public interest by ensuring the effectuation of a strong Congressional policy." Sierra Club v. Lynn, 364 F.Supp. 834, 850 (W.D.Tex.1973).

The strong Congressional policy which the plaintiffs effectuated was expressed by the passage of the Economic Opportunity Act of 1964 and by the establishment of the Office of Economic Opportunity. Part of the policy of the Act was to help end poverty by providing opportunities for education and the OEO was established to carry out this objective. 42 U.S.C. §§ 2701, 2942(h). Unlike many strong Congressional policies which have formed the basis for the award of attorneys' fees on the private attorneys general rationale, Congress did not intend to leave enforcement of this policy to individuals. The Office of Economic Opportunity was established to carry out these goals. As was found in the Court's previous opinion, however, the OEO had abandoned these goals at the time of this litigation, requiring private individuals to undertake, at great expense, the pursuit of the strong Congressional policies involved. In that opinion, the Court found that

> [s]ince his appointment as Acting
> Director of OEO on January 31, 1973,
> defendant Howard Phillips and other

OEO officials have embarked upon a plan designed to dismantle OEO, transfer some but not all of its programs to other agencies and to abolish OEO itself as an entity by June 30, 1973. The pursuit of this plan by OEO precluded it from focusing its attention on problems relative to some existing programs including the grant involved in this case. *Red School House, Inc., supra* at 1185 (footnote omitted).

This case, therefore, is analogous to the situation in *La Raza Unida* where the court found that the "only public entities that might have brought suit in this case were named as defendants . . . and vigorously opposed plaintiffs' contentions." *La Raza Unida, supra,* 57 F.R.D. at 101. Attorneys' fees were awarded to the private litigants in *La Raza* on the theory that it would be "tantamount to a penalty" to make the plaintiffs bear the cost of seeing to it that public agencies carry out the duties which they were established to perform. *Id.* Such an argument is even stronger in this case. *La Raza* was a suit challenging the construction of a highway and the attendant housing displacement. Conceivably, private plaintiffs in such a situation might possess the means to pay for the full services of attorneys. But here, when an anti-poverty agency involved in anti-poverty programs is the subject matter of the suit, the plaintiffs are almost sure to be poor.

In succeeding on the merits of this suit, plaintiffs in this case were awarded that which they would have received had the defendants acted in good faith, in accordance with their own regulations, and in a manner consistent with the strong congressional policies which OEO was created to implement. Because of defendants' conduct and their abandonment of the Congressional policy which plaintiffs enforced by this litigation, therefore, plaintiffs ought also to be awarded the additional expenses incurred in bringing this litigation.

Defendants, however, contend that 28 U.S.C. § 2412 bars the recovery of attorneys' fees in this case. The statute provides that a prevailing party in a civil action against the United States, its agencies or officials may be awarded some court costs "but not including the fees and expenses of attorneys" unless such an award is specifically provided for by statute. The basis for this law is the doctrine of sovereign immunity. This doctrine, at one time, precluded successful litigants from recovering any costs from the government. The statute is a limited form of waiver of this immunity with respect to certain costs other than attorneys' fees. *Cassata v. Federal Savings and Loan Ins. Corp.,* 445 F.2d 122, 125 (7th Cir. 1971). It has been said that the rationale for this rule is that

since public moneys cannot be paid out except under an appropriation by Congress, the courts will not enter against the government a judgment for costs which would require the payment of moneys from the public treasury, unless they are expressly authorized by Congress to do so . . . ." *Walling v. Norfolk Southern Ry.,* 162 F.2d 95, 96 (4th Cir. 1947).

In opposition to this argument, plaintiffs contend that proper authorization for the award of attorneys' fees against the government in this case does exist and that there is money already appropriated from the federal treasury which should be made available for this purpose. According to OEO's own regulations, the payment of certain attorneys' fees from federal government funds is authorized. In the proceedings before the OEO for the suspension and termination of grants, delegate agencies, such as the plaintiffs have been found to be in the Court's previous order, have a right to counsel and are authorized "to transfer sufficient funds from their current operating grants to pay the fees, travel, and per diem expenses of such attorney." 45 C.F.R. § 1067.2–5. This regulation clearly establishes that federal funds, those which have been granted to the agency, may be used to pay attor-

neys' fees in proceedings before the OEO.

OEO regulations, therefore, clearly provide a right to counsel at termination and suspension proceedings held before the agency pursuant to its own regulations. By OEO's conduct in this case, however, in refusing to grant to the plaintiffs the hearings and meetings called for by their own regulations, the regulation-granted right to counsel was denied. Plaintiffs, therefore, were forced to bring this litigation at their own expense as an alternative to the agency procedures.

 Had plaintiffs been able to obtain the administrative remedies to which they were clearly entitled, they would have been permitted to pay counsel out of their operating grant. Not only were the plaintiffs wrongfully deprived of the funds they had been granted, therefore, but they were also wrongfully deprived of the agency review procedure to which they were entitled, and of the authorization to pay counsel fees out of OEO funds. The provisions for attorneys' fees to be paid at the administrative level should, when the administrative body defaults in its responsibilities to participate in a meaningful review, be fully allowable for services rendered with respect to an appropriate action in the District Court. Likewise, legal fees incurred by the delegate agencies in attempting to alert OEO to its own responsibilities to follow its own regulations and fulfill its responsibilities under the Act should be fully compensable from OEO revenues.

When Congress passed the Economic Opportunity Act of 1964, it provided that the OEO should promulgate regulations which would allow entities such as plaintiffs, when faced with termination or suspension of their funds, to be "given reasonable notice and opportunity to show cause why such action should not be taken," 42 U.S.C. § 2944(2), and, in the case of termination, "reasonable notice and opportunity for a full and fair hearing." 42 U.S.C. § 2944(3). OEO, in attempted compliance with the statute, issued numerous procedural regulations, including the one which provides for the payment of attorneys' fees in proceedings before the agency.

Both Congress and the officials who drafted and promulgated the OEO regulations must have known that by its very nature as an anti-poverty agency, those who would come before it would be ill able to afford the services of an attorney should the retention of one be necessary. This is indicated by the fact that a major part of the OEO program was directed at providing free legal services for the poor. No doubt because of this knowledge, the OEO regulations provide for public payment of the counsel fees which would necessarily be incurred in practice before the agency in matters of suspension and termination.

Congress must have implicitly intended, therefore, that if the OEO ever failed to follow its own procedures, thus cutting off plaintiffs' ability to pay for counsel fees incurred in protesting a proposed suspension or termination, OEO funds could also be used to reimburse plaintiffs for their costs of litigation in federal courts. Such an intent, of course, cannot be inferred with respect to all government agencies, where the clients, as a rule, are not sure to be unable to pay for attorneys. Nor would it properly apply to direct appeals from OEO decisions which had been made by the agency acting in good faith, and attempting to follow its own procedures as mandated by its own regulations and enabling statutes.

In Pyramid Lake Paiute Tribe v. Morton, 360 F.Supp. 669 (D.D.C.1973), the District Court for the District of Columbia was confronted with a somewhat analogous situation. In that case, an Indian tribe which could request legal representation from the Attorney General, sued the Attorney General and the Secretary of the Interior, who would also be entitled to representation by the Attorney General. The tribe, therefore, engaged private counsel. In viewing the relevant statutes to hold that the plain-

tiffs could recover their attorneys' fees from the federal government, the Court found that Congress was well aware of the precarious financial conditions of most Indian tribes. Congress, the Court stated, "sought to place Indians in a position to act on their own initiative . . . to correct inequities and to facilitate presentation of their grievances to federal and state agencies." Id. at 671. In concluding that Section 2412 was not a bar to awarding of attorneys' fees in that case, the Court held that

> an aspect of these congressional determinations was the recognition that the Attorney General was not always able or willing to take up cudgels for the Tribes . . . .. Thus Tribes could retain independent counsel and expect to request the Courts for an award of attorneys' fees under specified circumstances such as the present case. Id.

Although the conclusion of the District Court was overturned on appeal, the Court of Appeals for the District of Columbia did not find fault with the approach of the District Court, but rather faulted it on its conclusion that the two statutes relied upon represented "an undertaking by the United States to pay [attorney's] fees." Pyramid Lake Paiute Tribe of Indians v. Morton, 499 F.2d 1095 (D.C.Cir., 1974). The statute, which the District Court read as imposing some obligation on the Attorney General to represent the Indian plaintiffs, 25 U.S.C. § 175, was held to be discretionary by the Court of Appeals. The other statute used by the District Court in its analysis, 25 U.S.C. § 476, was held by the Court of Appeals to be merely a requirement that Indian tribes recognize the role of the Secretary of the Interior in the choice of attorneys for the tribe. Neither of these two statutes are applicable to this case and the mode of analysis engaged in by the District Court was not criticized on appeal.

An approach similar to that of the District Court in Pyramid Lake, therefore, can be applied here. Congress established the Office of Economic Opportunity to aid poor people in this country. The Office, in turn, established recipient and delegate agencies for this purpose, and also established a set of regulations designed to prevent arbitrary suspensions and terminations of grants, with a panoply of procedural rights for affected entities. As Congress was found to have done with respect to Indian tribes by implication in the Pyramid Lake case, so the federal government did more explicitly for the poor people in this case. It sought to establish a program to correct economic inequities and to open "to everyone the opportunity for education and training." 42 U.S.C. § 2701. Other portions of the statute contain provisions designed to assure that poor people and disadvantaged minorities would be able to make their voices heard regarding the conduct of the agency. See, e. g., 42 U.S.C. §§ 2791, 2944 and 2977.

When, therefore, this Congressionally created system of helping the disadvantaged to participate effectively in agency matters breaks down, as it did in this case, the strongly expressed intent of Congress to provide this assistance should be carried out in the form of an award of attorneys' fees. For these reasons, therefore, Section 2412 is not a bar to the awarding of attorneys' fees in this case.

In addition, an award of attorneys' and expert witness' fees in this case would not contradict the underlying policy of sovereign immunity which serves as the basis for the prohibition of Section 2412 against such an award. The purpose of the prohibition and of Section 2412 is to prevent the expenditure of government funds without the authorization of Congress, the possessor of the spending powers of the federal government. Ordinarily, therefore, an award of attorneys fees in a case against the United States, over and above the amount recovered in the suit, would represent an additional drain on the treasury, unauthorized by Congress. In this case, however, funds have already been authorized and appropriated by Congress which are available as a

source of the award of attorneys' fees. These funds are the $67,000 appropriated and sent to the Minneapolis area which was to be used to fund the Milwaukee Indian Community Center. The Center was initially a plaintiff in this case, but was dismissed upon stipulation of counsel on May 8, 1973. In its previous opinion, however, the Court found that the proposed community center "unlike the schools, did not predate the grant and was never able to achieve a viable existence because of lack of funds." *Red School House, Inc., supra* at 1182.

Despite the Center's withdrawal from the case, however, there is convincing basis in the record for a finding that the conduct of the defendant was equally wrongful and illegal with respect to the termination of funding for the Center as it was for the schools. In addition, the Court previously found that the failure of the center was due to lack of funds. Defendant, therefore, should not benefit from the fact that its conduct so crippled one of the potential recipients that it was unable to maintain the suit, when it has already been found that the potential recipients who were able to weather the termination are entitled to their funds.

■■■ The existence of this fund of money out of which the plaintiffs requested fees may be paid makes this case similar to the "common fund" situation often encountered in requests for attorneys' fees. In such a situation, attorneys, whose efforts have created a fund of damages benefitting a large number of people in addition to their individual clients, may be entitled to draw their fees from the common fund. The rationale for this kind of award is that where an ascertainable class will benefit by the availability of the fund, the Court with jurisdiction over the fund may make an award to spread the cost of bringing the suit proportionately among those benefitted. Hall v. Cole, 412 U.S. 1, 5–6, 93 S.Ct. 1943, 36 L.Ed. 2d 702 (1973). Where such a common fund is created by a damage award

against the federal government, Section 2412 is not a bar to the award of attorneys' fees from the fund. Freeman v. Ryan, 133 U.S.App.D.C. 1, 408 F.2d 1204 (1968).

While this case clearly is not identical to the "common fund" cases, the situations are analogous in that there is a substantial amount of money, already appropriated from the general treasury fund, subject to the order of this court. In addition, the money previously awarded to plaintiffs and the money remaining on deposit are all part of a single OEO grant.

The $67,000, therefore, represents an amount of money duly authorized and appropriated by Congress, and allocated by the Office of Economic Opportunity. As has already been noted, it is clear that Congress intended that OEO funds be used, not only for direct aid to poor people, but also for legal and expert witness expenses necessarily incurred by the abdication of the OEO of its duties. The conclusion that such an expenditure would be consistent with the intent of Congress, therefore, is entirely justifiable. This is especially true in view of the overwhelming equities of this case in favor of awarding the requested fees and expenses to the plaintiffs.

The only remaining issue, therefore, concerns the amount of the award. Plaintiffs have requested a total of $22,342.73 in fees and expenses for their attorneys and accountants. Of this amount, $17,822 is attributable to attorneys' fees, $1,160.12 to their expenses, $3,345 to accountants' fees and $15.61 to accountant expenses. The requested attorneys' fee is based on an hourly rate of $35 for the time spent in representing the plaintiffs first before the OEO and then in this Court in connection with the grants at issue.

■■■ The rate at which an attorney might charge a private client willing and able to pay, however, is not necessarily appropriate to this case. There are times when members of the legal profession must represent clients unable

to pay and bring suits in the public interest, without the expectation of recovering their usual fees. In such instances, the *Criminal Justice Act*, 18 U.S.C. § 3006A(d) is "a reasonable guide for setting compensation in public interest civil litigation." Sierra Club v. Lynn, 364 F.Supp. 834, 851 (D.C.Tex.1973). That section provides for compensation at the rate of $30 per hour for time spent in court and $20 an hour for out of court time. Using these figures as a general guide, the Court will make an aggregate award of $15,000 to be paid by the plaintiffs as attorneys' and accountants' fees and expenses.

Accordingly, it is ordered that the plaintiffs Red School House, Survival School and Community School be awarded the total sum of $15,000 to be distributed to attorneys Larry B. Leventhal and Thomas Dixon and accountants Carol Klimmer and Melvin Goldfein as reimbursement for attorneys' and accountants' fees and expenses rendered in this action.

It is so ordered.