The CITYWIDE EDUCATION ACTION PROJECT, The Crown Heights Education Committee, Shellman Johnson, Violet R. Hines, and Helen Lord, Plaintiffs,

v.

The COMMUNITY SERVICES ADMINISTRATION OF the UNITED STATES (CSA), Graciela Olivarez (Director of CSA), Vaughn Gearan (Regional Counsel of CSA), Nevin Greene (Metropolitan Director of CSA), Grace McCabe (Senior Field Representative of CSA), Edward I. Koch (Mayor of the City of New York), The Human Resources Administration of the City of New York (HRA), Stanley Brezenoff (Commissioner of HRA), The Community Development Agency of the City of New York (CDA), Roger P. Alvarez (Commissioner of CDA), John Nolan (Director of the Audit Review Dept. of CDA), The Members of the Citywide Community Action Board of CDA, Robert Gersony and Joseph L. Jacobson, Defendants.

79 Civ. 6673 (LBS).

United States District Court,
S. D. New York.

Sept. 19, 1980.

Christine M. Naper, Attorney–Advisor, Community Services Administration, Ed Davis, Kresky, Sinawski & Davis, New York City, for plaintiffs.

John S. Martin, Jr., U. S. Atty., New York City, S. D. N. Y. by Stanley D. Davis, Asst. U. S. Atty., New York City, for Federal defendants.

Mary Tucker, Office of the Corp. Counsel, City of New York, New York City, for defendants.

OPINION

SAND, District Judge.

Plaintiffs Citywide Education Action Project ("CEAP"), Crown Heights Education Committee ("CHEC"), Shellman Johnson, Violet Hines and Helen Lord bring suit against federal and New York City defendants, in an action arising from what plaintiffs characterize as the termination of funding of two educational programs, CEAP and CHEC.[1] The federal defendants are the United States Community Services Administration ("CSA"), Graciela Olivarez, Director of CSA; Vaughn Gearan, Regional Counsel of CSA; Nevin Greene, Metropolitan Director of CSA; and Grace McCabe, Senior Field Representative of CSA.[2] Named as New York City defendants are the Community Development Agency of the City of New York ("CDA"); Roger P. Alvarez, Commissioner of CDA; John Nolan, Director of the Audit Review Department of CDA; the members of the Citywide

---

1. Plaintiffs' motion for a preliminary injunction directing the resumption of funding of these programs pending the disposition of this action was denied by this Court on December 11, 1979.

2. The complaint was clarified by Stipulation and Order entered January 11, 1980, in which it was agreed that the individual federal defendants are sued in their official capacities only and that, to the extent damages are sought from the federal defendants at all, such damages are sought exclusively from CSA.

Community Action Board of CDA; Joseph L. Jacobson, formerly Inspector General of CSA; Robert Gersony, an official of the City of New York; the Human Resources Administration of the City of New York ("HRA"), which, plaintiffs allege, bears responsibility for the operations of CDA; Stanley Brezenoff, Commissioner of HRA; and Edward I. Koch, Mayor of the City of New York.

Plaintiffs claim that they should have been afforded the procedures set forth in 42 U.S.C. § 2944(2) or 2944(3) governing appeals by grantees which have been "terminated" or "superseded" within the meaning of that statute. They seek a preliminary injunction directing the refunding and reinstatement of CEAP and CHEC, enjoining the continuation of review proceedings begun by defendants, and declaring such procedures illegal.[3] As permanent relief, plaintiffs seek a judgment declaring that the harassment and termination of the programs are illegal, declaring that CDA has breached its contract with plaintiffs, and awarding $1,000,000 in damages plus attorneys fees.

Plaintiffs apparently seek judicial review under the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Plaintiffs allege violations of their rights under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution, and deprivation of civil rights under 42 U.S.C. § 1983. Finally, plaintiffs ask for indemnification, back pay, damages and restoration of property, and claim deprivation of procedural due process under the Administrative Procedure Act, the Economic Opportunity Act, and unspecified provisions of New York law.

Federal and city defendants have moved to dismiss the complaint pursuant to Fed.R. Civ.P. 12(b)(6) on the ground that plaintiffs have failed to state a claim upon which

relief can be granted. In the alternative, city defendants seek summary judgment pursuant to Fed.R.Civ.P. 56.

## I. Background

CSA is the federal anti–poverty agency which is the successor to the Office of Economic Opportunity ("OEO"), the agency established by the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2701 et seq. ("the Act"). Under Title II of the Act, 42 U.S.C. §§ 2781–2837, federal money is made available to local communities for various "community action programs." 42 U.S.C. § 2795. These are defined as programs which are community based and operated and which include a sufficient number of projects or components to provide a range of services and activities which will have some impact on the causes of poverty in the particular community. 42 U.S.C. § 2790(a).

The mechanism for the administration of the funds is established by 42 U.S.C. §§ 2790 and 2791. Under these statutes, a community action agency (the grantee of the funds) may be a state or political subdivision of a state, or a public or private non–profit organization. 42 U.S.C. § 2790(a). Where the community action agency is a state or political subdivision thereof, the grant is to be administered through a community action board which meets certain statutory requirements. 42 U.S.C. § 2791(a). The community action board may, in turn, place responsibility for policy determinations in neighborhood–based local subsidiary boards. 42 U.S.C. § 2791(c).

In the instant case, the City of New York is the community action agency and is the direct grantee of funds under Title II; defendant CDA is the responsible city agency with respect to those funds; and, until June 30, 1977, the Council Against Poverty func-

---

**3.** The relief sought by plaintiffs appears to be rather curious. For example, renewed funding of the programs is sought on a preliminary basis only, although presumably plaintiffs seek this on a permanent basis as well. Moreover, since plaintiffs have alleged error in the fact that neither CSA nor CDA is engaged in review

of the programs (Complaint, Par. 32), it is far from clear precisely what review proceedings plaintiffs now want enjoined.

In any event, in light of the Court's rulings, *infra*, plaintiffs' prayers for preliminary and permanent injunctive relief are denied.

tioned as the City's community action board pursuant to 42 U.S.C. § 2791(c).

Exercising its authority under 42 U.S.C. § 2791(c), the Council Against Poverty created or recognized twenty–six community corporations to make certain decisions about the use of funds in their neighborhoods. The primary role of those community corporations is to develop programs, plan overall strategy and coordinate local poverty operations. Various "delegate agencies" and service organizations are funded under short term contracts through the community corporations.

In short, the overall funding scheme is as follows: CSA grants funds to the City of New York, by way of its antipoverty agency CDA; CDA, administering the funds through its community action board, funded twenty–six neighborhood based community corporations, one of which was the Crown Heights North Multi–Service Center, Inc., ("Crown Heights North"). CHEC and its alter ego CEAP were in turn funded through Crown Heights North.[4]

## II. *Facts*

Plaintiff CEAP is a project of CDA which began in 1976 and maintains offices in New York City. Complaint, Par. 13. Plaintiff CHEC, originally a local educational program in the community of Crown Heights, was created in 1967. *Id.* Par. 14. In 1974, it was established as a Council Against Poverty pilot project, (*Id.*) and in 1976 it became an advisory committee to CEAP. (*Id.*) Plaintiff Johnson is the director of both CEAP and CHEC, and plaintiffs Hines and Lord hold various positions in educational programs in Brooklyn. *Id.* Pars. 15–17.[5]

The most recent City contract through which federal Economic Opportunity Act funds were provided to CHEC was signed by CDA, acting on behalf of the City, and the Crown Heights Center. This contract, for the period October 1, 1977 through March 31, 1978, was extended to June 30, 1978 by an agreement between the parties. (City Exhibits B and C). While funding for CHEC was expressly provided in the original contract and its amendment, neither CHEC nor its alter–ego signed either document. CHEC received all its funding through the Crown Heights North Multi–Service Center, Inc. contract. (City Exhibits B and C). By memorandum from CDA to the Chairperson and Executive Director of Crown Heights North, the CDA contract period with the center was extended from June 30, 1978 to July 31, 1978 for the express purpose of providing CDA time within which to determine whether Crown Heights North warranted continued funding. (City Exhibit D). Crown Heights Center was urged to meet with CDA Field Operations and Program Audit staff to discuss audit

---

**4.** Overall responsibility for the federal funding of programs under the Act rests with the Director of the federal Community Services Administration (CSA). 42 U.S.C. § 2941. Pursuant to this authority, the Director of CSA, in July, 1977, ordered the restructuring of the City's administrative scheme and authorized the appointment of an interim administrator because of fiscal irregularities and failure to conduct neighborhood elections. This interim structure was held valid in *Bermudez v. Olivarez*, 77 Civ. 4822 (S.D.N.Y.1977), *appeal dismissed*, Docket No. 78–8178 (2d Cir. May 26, 1978).

Under the present structure: (1) Area policy boards have been established in each poverty area; (2) Delegate agencies in each poverty area implement programs decided upon by the area policy boards; (3) A City–wide administering board has been established; and (4) The Mayor of the City of New York exercises major policy making powers in the determination of fiscal, personnel and program policies and retains final approval of all delegate agencies proposed by the area policy boards. No delegate agency may be accepted by the Mayor for contracting unless it has been proposed by an area policy board.

**5.** Although the complaint contains no allegations that either Hines or Lord has any official relationship with CEAP or CHEC, plaintiff Hines' affidavit submitted in support of the motion for a preliminary injunction states that she has been a member of CHEC since 1969. Hines Aff., Par. 4. City defendants have challenged the standing of plaintiffs Hines and Lord, but do not question the standing of plaintiffs Johnson and CHEC. It is therefore unnecessary for this Court now to resolve the issue of whether plaintiffs Hines and Lord have standing to sue.

findings and to present any additional information it desired. (*Id.*) The CDA contract with Crown Heights North, the corporation through which CHEC received all its funding, expired on July 31, 1978 and was not renewed.[6] The contract expressly stated that there was no right to renewal and that CDA was under no obligation to renew its agreement or to continue the program, in whole or in part, after the expiration of the contract period. (See City Exhibit B2, Article VIII, Section A.)

Plaintiffs allege that on August 11, 1978, plaintiff Johnson was informed by CDA that funding for CEAP and CHEC would cease on August 31, 1978, notwithstanding the fact that these programs were budgeted until September 30, 1978. Complaint Par. 19, (Pl. Exhibit C.). CDA invited CEAP and CHEC to appeal this "termination"[7] and to submit a proposal for further funding to CDA pursuant to Instruction 6441–1 of the Office of Economic Opportunity ("OEO"). *Id.*, Par. 20. Johnson followed this procedure, with the result that CDA extended funding until September 15, 1978 to accommodate the closeout of the programs. *Id.*, Par. 21. Johnson's requests that he be furnished with the reasons why his proposal was rejected went unanswered by CDA, and on October 19, 1978, CEAP and CHEC were evicted from their offices by the Inspector General of CDA, thus terminating the operation of the programs. *Id.* Pars. 22–24.

Thereafter, the Commissioner of CDA sent a copy of his determination with respect to CEAP and CHEC to defendant Gearan, Regional Counsel of CSA. *Id.*, Par. 25. On January 8, 1979, Gearan notified CDA that it had not given fair and adequate consideration to the CEAP/CHEC proposal and directed that the proposal be reconsidered on or before January 31, 1979. *Id.*, Par. 26. (Pl. Exhibit E). CDA again rejected the proposal, and, pursuant to the programs' appeal, Gearan again rejected the determination on the ground that CDA had not given the proposal fair considera-

---

**6.** Upon expiration of the contract, Crown Heights North Multi–Service Center, Inc. commenced an action seeking an injunction against the cut–off of funding. *Crown Heights North Multi-Service Center, Inc. v. Koch*, 78 Civ. 3995 (S.D.N.Y.1979).

Judge Owen dismissed the complaint against the United States defendants until there had been an exhaustion of administrative remedies and denied the preliminary injunction against the City defendants because he found insufficient support for a duty to renew the contract:

"As I have read the authorities plaintiffs have put before me, I do not see that their claim of a duty to renew or a claim of continuity is supported by those authorities. The continuity that is being spoken of is one of services generally, and not of the continuity of the specific agency. There is no question here, and I find as a fact that there was a contract with the plaintiff, Crown Heights, the contract terminated some two or three months ago—

\* \* \* \* \* \*

"THE COURT: And, that it was not renewed. I do not find a duty to renew, or let me put it differently, I do not find sufficient support for a duty to renew to have a feeling that I must, for a motion of preliminary injunction that the plaintiffs' probability of success warrants continuing the outlays of money to this particular disbursing sub–agency."
Transcript of hearing, September 5, 1978, at p. 48, City Exhibit E. Judge Owen dismissed

Crown Heights' action on May 4, 1979 for lack of prosecution (City Exhibit F).

**7.** 45 C.F.R. § 1050.115–2(a) defines "termination" of a grant as "the cancellation of federal assistance, in whole or in part, under a grant at any time *prior to its date of completion.*" (Emphasis added).

City defendants dispute that funding for CHEC was "terminated" as defined by 45 C.F.R. § 1050.115–2(a). They contend that the contract through which CHEC received its funding expired on July 31, 1978 and that to accommodate the close-out of CHEC, CDA continued funding the program first through August 31, 1978, and then through September 15, 1978. City defendants argue that in August 1978, CDA invited Johnson to submit a proposal for funding of CHEC as a delegate agency, that CHEC submitted a proposal which CDA decided not to fund, and that CSA appealed this decision to CSA under CSA Instruction 6444–1, *Appeal to CSA by an Organization that would like to serve as a Delegate Agency.* See Affidavit of Mary C. Tucker, Pars. 30–33. See also Pl. Exhibit G, (chronology in Report of the Committee on the Crown Heights Education Committee Proposal).

For the purpose of the Court's discussion of defendants' Rule 12(b)(6) motion, we will accept as true plaintiffs' characterization of events.

tion. *Id.,* Par. 27. (Pl. Exhibit F). CDA was asked to have the Community Action Board of CDA consider the proposal when that body was formed. *Id.*

On July 5, 1979, the Community Action Board adopted its subcommittee's recommendation that the CEAP/CHEC proposal be rejected. *Id.,* Par. 28. (Pl. Exhibit G). Plaintiffs allege a variety of procedural irregularities in connection with this determination. *Id.,* Pars. 29–31. By letter dated July 30, 1979, CSA was informed of the steps taken by the Community Action Board to review CHEC's application and of its decision not to fund. (City Exhibit K). In this letter, it was noted that CHEC "was free to submit ... [its] ... proposal to an Area Policy Board through the open submission process." (*Id.*). CHEC has apparently not made such a submission.

III. *Appeal Procedures Under 42 U.S.C. § 2944*

Plaintiffs contend that upon notice on August 11, 1980 by the CDA that funding for their programs would not be continued, they were entitled to the administrative review set forth in 42 U.S.C. § 2944(2) and 2944(3). They allege that CDA improperly channeled them into the appeal procedure of 42 U.S.C. § 2944(1) and that the federal defendants failed to rectify this error. Complaint, Pars. 20–21, 26.

A. *The Statute*

42 U.S.C. § 2944 provides:

*Appeals, notice, and hearing*

The Director shall prescribe procedures to assure that—

(1) Special notice of and an opportunity for a timely and expeditious appeal to the Director is provided for an agency or organization which would like to serve as a delegate agency under subchapter II of this chapter and whose application to the community action agency has been wholly or substantially rejected or has not been acted upon within a period of time deemed reasonable to the Director;

(2) financial assistance under subchapter II of this chapter and part B of subchapter III of this chapter shall not be suspended for failure to comply with applicable terms and conditions, except in emergency situations, nor shall an application for refunding under sections 2808, 2809, or 2862 of this title be denied, unless the recipient agency has been given reasonable notice and opportunity to show cause why such action should not be taken; and

(3) financial assistance under subchapter II of this chapter and part B of subchapter III of this chapter shall not be terminated for failure to comply with applicable terms and conditions unless the recipient agency has been afforded reasonable notice and opportunity for a full and fair hearing.

Paragraph (1) of Section 2944 thus mandates that the Director of CSA shall provide procedures under which an organization seeking to become a delegate agency or community action agency may be provided an appeal of an adverse determination by the community action agency regarding the funding proposal. The procedures implementing Paragraph (1) appeals are contained in CSA instruction 6441–1, Appeal to OEO by an Organization that would like to serve as a Delegate Agency, (Pl. Exhibit B; City Exhibit A), promulgated on March 14, 1972 and codified at 45 C.F.R. § 1064.1 (1979). These were the appellate procedures afforded plaintiffs in this case.

The policy of the Instruction is both to provide the appeal mandated by Section 2944(1) and to preserve the allocation of authority between the Federal government and the grantee, by "preserv[ing] for a CAA [Community Action Agency] primary responsibility for the planning, administration and evaluation of community action programs in the community in which it serves." Instruction 6441–1, Par. 1, 45 C.F.R. § 1064.1–4. The appellate procedure is set forth, as well as the criteria to be used by the CSA official processing the appeal. *Id.,* Pars. 3, 4, 45 C.F.R. § 1064.1–6, 7. The determination of the community

action agency is to be upheld unless the official determines that it "did not give fair and adequate consideration to the rejected applicant's application," or that the decision will have a "decidedly adverse impact" on the quality of the poverty program in the community. *Id.*, 45 C.F.R. § 1064.1–7(a)(1), (2).[8] It was under the former criterion that defendant Gearan twice asked CDA to consider afresh the plaintiffs' proposal for funding. Complaint, Pars. 26–27.

Paragraph (2) of Section 2944 deals with the appellate rights of programs directly affected by action taken by CSA. Thus, this paragraph mandates that funding under Subchapters II and III(B) of the Act shall not be suspended for failure to comply with applicable terms and conditions, nor shall applications for refunding under Sections 2808, 2809 or 2862 of the Act be denied, unless the recipient agency is given notice and an "opportunity to show cause" why the action should not be taken.

Similarly, Paragraph (3) of Section 2944 states that funding under Subchapters II and III(B) of the Act shall not be terminated for failure to comply with applicable terms and conditions unless the recipient agency is given notice and a "full and fair hearing."

### B. *Discussion*

Plaintiffs claim that they were entitled to the more extensive appellate procedures of Paragraphs (2) or (3) of Section 2944 because the CDA notification of August 11, 1978 that plaintiffs' funding would not be continued constituted a "suspension" or "termination" as those concepts are utilized in those paragraphs. Complaint, Pars. 19–20. We are unpersuaded by this argument for several reasons.

First, plaintiffs were not "recipient agencies" within the meaning of Paragraphs (2) or (3), a status which would trigger the appellate procedures provided in those paragraphs. Thus, plaintiffs do not allege that they were receiving funds under Subchapter II of the Act. In fact, they recognize that the Subchapter II funds in this case are granted to the City of New York and its anti–poverty component, defendant CDA. Complaint, Par. 10. Moreover, the complaint does not allege that plaintiff received funding pursuant to Subchapter III(B) or Sections 2808, 2809 or 2862 of the Act, a fact which would also bring them within the meaning of the term "recipient agencies" in Paragraphs (2) and (3) of Section 2944. In their brief, however, plaintiffs

8. "§ 1064.1 -7 Criteria for resolving appeal.

(a) The responsible CSA official shall, whenever possible, decide the appeal before the CAA submits its formal funding request. To maintain the principle of local initiative in community action programs, the responsible CSA official will sustain the action of the CAA unless he/she finds that:

(1) The CAA did not give fair and adequate consideration to the rejected applicant's application,

(2) Or the decision of the CAA will have a decidedly adverse effect on the quality of the overall community action program in the local community or would preclude achievement of the objectives of a Special Emphasis program as described in Section 222(a) of the Act.

(b) If the responsible CSA official concludes that the CAA did not provide fair and adequate consideration of the application, he/she shall return it to the CAA with the requirement that it reconsider the application and inform the responsible CSA official in writing of the steps taken to reconsider the application and of the decision reached.

(c) If the applicant has received a fair and adequate consideration, the responsible CSA official may nonetheless review the case to ascertain whether criterion in paragraph (a)(2) of this section has been met. In reviewing the case, the CSA official shall bear in mind the amount of funds available to both the CAA and/or the prospective applicant. Options open to the reviewing official include, but are not limited to:

(1) Sustaining the rejection of the applicant;

(2) Direct funding of the rejected applicant in those instances where CSA is so authorized by the Act (ordinarily limited to Special Emphasis program described in Section 222(a) of the Act);

(3) Requiring that the CAA reconsider the rejected application; and

(4) Taking such other steps as may be deemed appropriate under the circumstances, including not providing funds to the CAA to administer the program which the rejected applicant wanted to carry out.

(d) The responsible CSA official shall promptly inform the applicant and the CAA in writing of his/her decision."

contend that they are within the class of programs entitled to Paragraph (2) or (3) appeals because "CHEC" was a "pilot project" funded under 42 U.S.C. §§ 2808, 2823, and 2825. (Pl. Br. at 13). These statutes provide authority for CSA funding of certain types of projects. Section 2808 authorizes CSA grants to community action agencies and certain other limited purpose agencies; Section 2823 authorizes CSA to provide technical assistance and training to certain community programs; and Section 2825 constitutes statutory authority for CSA direct funding of certain research and pilot programs (with the approval of the community action agency for the area in which the pilot project is proposed to function).

■ These statutes clearly contemplate funding *by* CSA of certain programs. Plaintiffs, however, by their own pleadings, claim that they received funds only from CDA in its administration of the funds granted to it by CSA. *E. g.*, Complaint Par. 13; Johnson Aff. Par. 9; Hines Aff. Par. 7 ("The CHEC developed its own work program under the authority of CAP/CDA from whom it received its grant . . . ."). Nowhere do plaintiffs allege that they received funds directly from CSA: hence, the statutes set forth in the brief are not applicable here.

■ Moreover, with respect to plaintiffs' alleged status as a CSA "pilot project" under 42 U.S.C. § 2825, plaintiff Johnson asserted in his original affidavit that in 1974 "the New York City Council Against Poverty (C.A.P.) established CHEC as a *city pilot project* to carry out a C.A.P. resolution . . . ." (Johnson Aff. Par. 6) (emphasis added). By plaintiffs' own admission, this city pilot project ended in May 1976, over three years prior to the termination of the funding about which they now complain. (Johnson Aff. Pars. 7–8; Complaint Par. 14). Plaintiffs' former status as a city pilot project is insufficient to bring it within the group of CSA grantees entitled to Section 2944(2) and 2944(3) appeals.

■ Plaintiffs also are unable to avail themselves of the appellate procedures of Paragraphs (2) and (3) because those procedures may be invoked only upon the suspension, denial of refunding, or termination of a program "for failure to comply with applicable terms and conditions." These terms and conditions are those applicable to the particular grant program referenced in the Paragraphs and pursuant to which the recipient agency is receiving funds from CSA. CDA could not have acted toward plaintiffs on the basis of their compliance or non–compliance with the "terms and conditions" of a Title II grant. CSA alone is empowered under the Act to determine compliance with the terms and conditions of grants authorized by the Act, and then only with respect to grantees of funds by CSA. *E. g.*, 42 U.S.C. § 2790. Although specific powers and functions are conferred upon community action agencies by 42 U.S.C. § 2795, these do not include evaluation of programs vis–a–vis the terms and conditions of CSA grants under the Act. Thus, whatever the rationale for CDA's action toward plaintiffs, the basis for that action could not have constituted a legally sufficient predicate for invocation of the appellate procedures of Paragraphs (2) and (3) of Section 2944.

The issue effectively posed here by plaintiffs is whether CSA must provide appellate review pursuant to 42 U.S.C. §§ 2944(2) or 2944(3) to a program alleging that it has been improperly terminated by a CSA grantee. This appears to be a question of first impression.

Where litigation over Section 2944 appellate rights has occurred, it has been in the context of a CSA grantee plaintiff claiming a right to either a Paragraph (2) or Paragraph (3) appeal based upon action taken against it *by CSA*. Thus, the courts have had no opportunity to address the precise issue of whether a program's status as a non–grantee precludes an appeal to CSA pursuant to Paragraph (2) or Paragraph (3) of Section 2944. *See National Consumer Information Center v. Gallegos*, 549 F.2d 822 (D.C.Cir.1977); *E.O.C. of Nassau Co. v. Weinberger*, 524 F.2d 393 (2d Cir. 1975);

*Mil–Ka–Ko Research & Development Corp. v. OEO*, 352 F.Supp. 169 (D.D.C.1972), *aff'd without opinion*, 497 F.2d 684 (D.C.Cir. 1974).[9]

█ In light of the foregoing analysis of "recipient agencies" and "terms and conditions" as set forth in §§ 2944(2) and 2944(3), the Court concludes that Paragraph (2) and (3) appellate procedures can be provided only to *direct grantees* of funds from CSA pursuant to the enumerated grant authorization sections in circumstances where CSA itself has terminated, suspended or refused to refund the grantee.[10] This is the interpretation of 42 U.S.C. § 2944 consistently made by CSA in its detailed regulations promulgated to implement the mandates of Paragraphs (2) and (3). See 45 C.F.R. § 1050.115 (1979). "Termination and suspension" of a grant have been defined to mean only CSA's cancellation or suspension of federal funds provided directly by CSA to its grantee. 45 C.F.R. §§ 1050.115–2(a), (b); 1050.115–4; 1050.115–5.[11] "Failure to comply with grant terms and conditions" is defined exclusively within the context of a grantee's non–compliance with the conditions upon which it has received funds directly from CSA and what action CSA may appropriately take in response thereto. 45 C.F.R. § 1050.115–3. Throughout this comprehensive regulation governing appeals pursuant to Paragraphs (2) and (3) of Section 2944, there is no provision or mandate that CSA provide these appeals to an entity other than a direct grantee. In the instant case, the only party who could potentially invoke the appellate procedures is the City of New York (CDA), and then only if CSA proposed to terminate or suspend the City's grant.[12]

9. Plaintiffs argue that the holding in *Mil–Ka-Ko Research, supra*, clearly entitles CHEC-CEAP to a paragraph (2) show cause hearing at the very least. (Pl. Br. at 27, L. 1). *Mil–Ka Ko*, however, is clearly distinguishable from the instant case. There, a *direct grantee* of OEO was notified by OEO that its grant would not be refunded at the expiration of the grant term. Accordingly, the recipient agency was given a "show cause" hearing pursuant to 42 U.S.C. § 2944(2). Thereafter, the agency brought suit, claiming that the denial of refunding by OEO triggered more extensive due process rights than those afforded by the show cause hearing. The court rejected the argument on the ground that the recipient agency had no property interest in the continuation of its grant. 352 F.Supp. at 171–73.

In short, contrary to plaintiffs' contentions, CHEC is not a "similar agency" to the plaintiff in *Mil–Ka-Ko* because in that case, the plaintiff was a direct grantee of funds from OEO.

10. Support for the proposition that non–direct grantees do not have a right to a Paragraph (2) or (3) appeal is suggested by *Red School House, Inc. v. OEO*, 386 F.Supp. 1177 (D.Minn. 1974). There, OEO provided funds to a grantee for the use of the grantee's delegate agencies. OEO thereafter suspended the grant, and the delegate agencies brought an action against OEO, alleging *inter alia*, that they should have been provided a pre–suspension hearing by OEO. The court held that the delegate agencies did have such a right, but only after a careful analysis noting that the "grant was to be for the sole benefit of the [delegate agencies]" and that the grantee "was to be a mere conduit of funds for a program which had been worked out between plaintiffs and OEO before [the grantee] was sought as the middleman." *Id.* at 1187, 1189. Additional support for the holding was found in the fact that the sole basis for OEO's suspension of the grant was the conduct of the delegate agencies. *Id.* at 1188 89.

None of the factors upon which the delegate agencies' appellate rights were based in *Red School House* are present here. CSA has taken no action at all, either toward its grantee CDA or plaintiffs. Moreover, CDA is not a "mere conduit" for funds to plaintiffs, nor did CSA seek out CDA for the purpose of providing funds to plaintiff. In *Red School House*, the delegate agencies were no more than the alter egos of the grantee and were therefore entitled to the same procedural rights as the grantee. Such a relationship does not exist between CDA and plaintiffs.

11. 45 C.F.R. § 1050.115–2(b) defines the suspension of a grant as "an action by CSA that temporarily suspends Federal assistance under the grant, pending a decision by CSA to terminate the grant." 45 C.F.R. § 1050.115–5 states that "[w]henever it is determined that a grantee has failed to comply with the terms and conditions of its grant, CSA may terminate the grant in whole or in part at any time prior to its date of completion."

12. It should be noted that the role of the delegate agency in the appellate process is not untreated by the regulations. Where CSA's adverse action is based on the conduct of a grantee's delegate agency, that agency has the right to participate in the hearing. *See* 45 C.F.R. §§ 1050.115–7(c)(5) (suspensions);

Thus it is clear that CSA, through its regulations, has interpreted Section 2944 quite differently from the interpretation urged upon the Court by plaintiffs. It is well–settled, of course, that the interpretation made by the agency charged with the administration of a statute is entitled to substantial deference. *Quern v. Mandley*, 436 U.S. 725, 738, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978); *New York Dep't. of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973). Indeed, "the construction of a statute by those charged with its execution should be followed *unless there are compelling indications that it is wrong . . . ."* *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (emphasis added).

A holding that CSA should have provided a Paragraph (2) or (3) appeal to plaintiffs under the circumstances of this case would undercut the purposes of the Act. Under the Economic Opportunity Act of 1964, community action agencies, such as defendant CDA, are autonomous organizations given wide authority to determine which particular programs will most benefit the low–income members of their community. Indeed, the principle of local autonomy rather than federal control underlies the Act. Thus, 42 U.S.C. § 2781, which sets forth the Congressional statement of purpose of Title II, provides in part:

"Its [the Act's] specific purposes are to promote, as methods of achieving a better focusing of resources on the goal of individual and family self–sufficiency–

(1) the strengthening of *community capabilities for planning and coordinating Federal, State, and other assistance related to the elimination of poverty, so that this assistance, through the efforts of local officials, organizations, and interested and affected citizens, can be made more responsive to local needs and conditions* ;

\*      \*      \*      \*      \*      \*

1050.115–8(c)(5) (terminations). Inasmuch as CSA took no action at all against its grantee, these provisions are inapplicable to the facts of this case.

(4) the development and implementation of all programs and projects designed to serve the poor or low–income areas with the *maximum feasible participation of residents of the areas and members of the groups served, . . .* " (emphasis added).

The notion that the Act embodies the principle of local control of the operation of anti–poverty programs was recognized by the Supreme Court in *United States v. Orleans*, 425 U.S. 807, 818, 96 S.Ct. 1971, 1977, 48 L.Ed.2d 390 (1976): [13]

"Nothing could be plainer than the congressional intent that the local entities here in question [a community action agency and one of its programs] have *complete control* over operations of their own programs with the Federal Government supplying financial aid, advice, and oversight only to assure that federal funds not be diverted *to* unauthorized purpose." (Footnote and citations omitted; emphasis added). See also *Johnson v. Jumelle*, 359 F.Supp. 361, 362 (S.D.N.Y.1973).

The complaint in this case reveals that plaintiffs' contentions arise out of a dispute between them and a CSA grantee as to the appropriate use of federal anti–poverty funds administered by the grantee in its community. CSA itself did not make the decision to fund plaintiffs in the first instance or to discontinue plaintiffs' funds. Were CSA required to provide hearings to programs and individuals in plaintiffs' position, it would be injected into the day–to–day decisionmaking processes of its local grantees. Such a result would run counter to the purposes of the Act.

In sum, it is well settled that a complaint should not be dismissed for failure to state a claim unless it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *E. g., Conley v. Gibson*, 355 U.S. 41, 45–46, 78

13. The issue in *Orleans* was whether a program receiving anti–poverty funds from a community action agency was an "agency" or "instrumentality" of the Government within the meaning of the Federal Tort Claims Act.

S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Frankos v. LaVallee*, 535 F.2d 1346 (2d Cir. 1976). The complaint in this action with respect to the administrative appeal submitted by plaintiffs falls squarely within this rule and should be dismissed. Even if one assumes *arguendo* that each of plaintiffs' allegations are true, plaintiffs are not entitled as a matter of law to administrative appeal pursuant to Sections 2944(2) and (3).

## IV. *Judicial Review of Action by CSA and City Defendants*

Plaintiffs apparently seek judicial review of the actions of CSA under the Administrative Procedure Act. Moreover, they apparently seek review of various actions and determinations of the city defendants. We turn now to the question of judicial review.

### A. *CSA*

Although not specifically alleged in their complaint, plaintiffs assert in their brief that there were a variety of procedural deficiencies in defendant Gearan's review, pursuant to 42 U.S.C. § 2944(1) and Instruction 6441–1 (45 C.F.R. § 1064.1), of CDA's rejection of plaintiffs' application to become a CDA delegate agency. (Pl. Br. at 9–16). The CSA review, however, comported with applicable regulations.

As has been noted, 45 C.F.R. § 1064.1 (1979) implements the mandate of 42 U.S.C. § 2944(1) that CSA provide an appeal for an organization whose application to become a delegate agency is rejected by the community action agency. The appellate procedure may be summarized as follows:

(a) the rejected agency has the burden to initiate the appellate procedure by submitting its appeal to CSA, 45 C.F.R. § 1064.1–6(a)–(c);

(b) the community action agency may submit material in reply to the appeal if it chooses, 45 C.F.R. § 1064.1–6(d); [14]

(c) "To maintain the principle of local initiative" the community action agency's decision must be upheld unless there is a specific finding that (i) the agency did not give fair and adequate consideration to the application, or (ii) the rejection will have an adverse impact on the quality of the community action program, 45 C.F.R. § 1064.1–7(a);

(d) If it is determined that the community action agency did not give fair and adequate consideration, the application is to be returned to the agency for reconsideration and notification to CSA of the results, 45 C.F.R. § 1064.1–7(b);

(e) If it is determined that the community action agency did give fair and adequate consideration in its rejection of the application, CSA nevertheless has discretion to make further review of the program with certain specified options available, 45 C.F.R. § 1064.1–7(c); and

(f) The CSA official processing the appeal is to notify the applicant and the community action agency of his decision, 45 C.F.R. § 1064.1–7(d).

These steps were followed in this case. As has been noted, on January 8, 1979, defendant Gearan responded to plaintiffs' appeal by informing CDA and plaintiff Johnson that CDA had not given fair and adequate consideration to CHEC's application and that, therefore, the application should be reconsidered. (Pl. Exhibit E). Following that reconsideration, Gearan, by letter of February 28, 1979, again notified CDA and plaintiff Johnson that CDA has failed to give fair and adequate consideration to the CHEC Proposal. (*Id.*, Ex. F). In this letter, however, Gearan delineated "what additional steps must be taken for CHEC's proposal to receive 'fair and adequate consideration' under the circumstances." (*Id.*) Specifically, he required that the

---

14. § 1064.1-6(d) provides that: "The CAA may, within 10 days of receiving a copy of the appeal, submit to the responsible CSA official material in reply to the appeal. The CAA shall also send a copy of such material to the applicant making the appeal."

Plaintiffs allege that Commissioner Alvarez on two separate occasions failed to comply with this provision. Complaint, Pars. 25, 27. Nowhere do plaintiffs allege that they complained of this irregularity at the administrative level before seeking judicial review.

CHEC proposal was to be considered by the new community action board. (*Id.*) This was done; the application was again rejected; and a report of the board's consideration was made. (*Id.*, Ex. G).

Thus, defendant Gearan insured that the mandates of 42 U.S.C. § 2944(1) and 45 C.F.R. § 1064.1 were met in this case. He insured that CHEC's application was given fair and adequate consideration by requiring that the new community action board, which included representatives of the community, evaluate plaintiffs' proposal. Thereafter CSA's involvement with the CDS determination was at an end.[15]

■ To the extent plaintiffs argue that defendant Gearan had some duty to process their appeal subsequent to consideration of plaintiffs' proposal by the community action board (*cf.* Pl. Br. at 11–13), it is important to note that nowhere do plaintiffs allege that *after* the determination by the new community action board, they sought further review from CSA, or challenged Gearan's determination that board review would constitute "fair and adequate consideration" of the proposal. Having thus failed to raise such issues at the administrative level in a timely fashion, plaintiffs may not now, upon judicial review of Gearan's actions, complain of these matters for the first time. *See, e. g. United States v. L. A. Tucker Truck Lines,* 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (1952).

■ The appropriate scope for judicial review of defendant Gearan's actions is that set forth at 5 U.S.C. § 706(2)(A)–(D) of the Administrative Procedure Act. Thus, the standard for this Court in this regard is whether Gearan's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or failed

to comply with statutory or procedural requirements. *Gaines v. Martinez,* 353 F.Supp. 780, 791 (N.D.Tex.1972). After considering Gearan's actions against this standard, the Court concludes that they were not arbitrary, capricious, or an abuse of discretion, and that they were in accordance with law and complied with statutory and procedural requirements.[16]

## B. *CDA*

Again, although not clearly set forth in their complaint, in their brief plaintiffs apparently seek judicial review of various administrative actions and determinations of the city defendants, charging that the city defendants violated their own procedures and guidelines, and committed other errors in improperly "terminating" CEAP and CHEC. The Court declines to exercise jurisdiction over these pendent claims, and they are hereby dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## V. *Other Allegations*

The Court now turns to the remaining allegations raised by the plaintiffs against the federal and city defendants.

### A. *Claims Against Federal Defendants*

Plaintiffs argue that the federal defendants have committed both unspecified common law torts and unspecified violations of their constitutional rights. (Pl. Br. at 31–39). These claims are patently frivolous.

■ Although the Stipulation and Order of January 11, 1980 [17] entered between plaintiffs and the federal defendants leaves open the possibility that the $1,000,000 in damages sought by plaintiff in this action are sought from CSA, this claim for mone-

---

**15.** CSA made no further discretionary review of plaintiffs' program pursuant to 35 C.F.R. § 1064.1–7(c). See note 8, *supra.*

**16.** Plaintiffs rely on *E.O.C. of Nassau Co. v. Weinberger,* 524 F.2d 393 (2d Cir. 1975) for the proposition that CSA's review pursuant to Instruction 6441–1 was procedurally defective. That case stands in part for the proposition that a community action agency had no stand-

ing to complain that a rejected delegate agency's appeal was not properly processed absent demonstration of prejudice to it as a result of procedural irregularities. *Id.* at 400–01. Plaintiffs, however, have made no showing here that they were prejudiced by the appeal provided by CSA because of procedural irregularities.

**17.** See note 2, *supra.*

tary relief cannot succeed. Plaintiffs have made no allegations against CSA or its agents that, if true, would constitute a tort; even if defendant Gearan erred in the type of appeal he provided plaintiffs, this error would not be tortious. Moreover, the Supreme Court has made clear in *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), that recipients of federal anti–poverty funds do not thereby become agents of the government for purposes of the Federal Tort Claims Act. Thus, plaintiffs may not hold the government vicariously responsible for any alleged torts of the City defendants. Plaintiffs' claim for monetary relief must also fail because they have not alleged jurisdiction under the Federal Tort Claims Act; and, even if that basis of jurisdiction were alleged, they have not alleged filing of the administrative claim against CSA which is a jurisdictional prerequisite to a tort action against a government agency pursuant to 28 U.S.C. § 2675(a). *See, e. g., House v. Mine Safety Appliance Co.,* 573 F.2d 609 (9th Cir. 1978); *Lunsford v. United States,* 570 F.2d 221 (8th Cir. 1977); *Kantor v. Kahn,* 463 F.Supp. 1160 (S.D.N.Y.1979).

■ Moreover, plaintiffs do not allege that they had a contract with the federal defendants, the breach of which might give rise to an action for monetary damages. Even if plaintiffs' complaint against the federal defendants were construed to sound in contract, the amount of damages sought is well in excess of this Court's jurisdictional limit of $10,000 in contract actions against the government established by 28 U.S.C. § 1346(b); thus the action would belong in the Court of Claims. *See Estate of Watson v. Blumenthal,* 586 F.2d 925, 928 (2d Cir. 1978).

Finally, plaintiffs have waived all claims arising under the Constitution pursuant to the authority of *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). As has been noted, by Stipulation and Order entered January 11, 1980, plaintiffs agreed that all named individual federal defendants are sued in their official capacity only. Inasmuch as *Bivens* speaks only to the individual liability of federal officials, it does not, as plaintiffs suggest, provide a predicate for entry of a monetary judgment against a federal agency.

### B. *Claims Against City Defendants*

■ Plaintiffs allege in vague and conclusory terms that city defendants have violated their civil rights under 42 U.S.C. § 1983. Civil rights complaints are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than stating legal conclusions. *Koch v. Yunich,* 533 F.2d 80, 85 (2d Cir. 1976); *Powell v. Workmen's Compensation Board of the State of New York,* 327 F.2d 131, 137 (2d Cir. 1964); *Johnson v. County of Chester,* 413 F.Supp. 1299, 1312 (E.D.Pa.1976). Accordingly, plaintiffs' allegation of violation of civil rights is dismissed.

Plaintiffs make further general, vague allegations against the city defendants for breach of contract and violations of state law. In any event, the Court declines to exercise jurisdiction over these pendent claims, and they are dismissed. *See United Mine Workers v. Gibbs, supra.*

Finally, in their complaint, plaintiffs allege in vague and conclusory terms violations of their rights by cited defendants under the First, Fourth, Fifth, Ninth and Fourteenth Amendments. In their brief, they apparently attempt to substantiate these claims. The complaint is dismissed with respect to the constitutional allegations just noted. While we do not condone plaintiffs' practice of seeking in a brief to furnish material which is essential to the validity and comprehensibility of a complaint, we nevertheless grant plaintiffs 30 days from the date hereof to replead those constitutional claims in a clear fashion consistent with the rulings herein.

So ordered.