**A. Ernest FITZGERALD, Plaintiff,**

v.

**Robert E. HAMPTON, et al.,
Defendants.**

Civ. A. No. 76–1486.

United States District Court,
District of Columbia.

March 31, 1982.
Settlement Agreement June 15, 1982.

John Bodner, Jr., Albert O. Cornelison, Jr., William L. Sollee, Washington, D.C., for plaintiff.

R. Lawrence Dessem, Anthony W. Norwood, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

This case is before the court on plaintiff A. Ernest Fitzgerald's motion for attorney's fees. For the reasons set forth in this memorandum, the court grants plaintiff's motion.

## I. HISTORY OF THE CASE

Plaintiff A. Ernest Fitzgerald was severed from his Air Force job in 1970, after he testified before Congress concerning costs of the C–5A transport plane.[1] Fitzgerald appealed his dismissal to the Civil Service Commission ("CSC"). The CSC concluded that Fitzgerald's dismissal resulted from "reasons that were personal to" Fitzgerald and directed the Air Force to restore Fitzgerald to his previous position as Deputy Assistant Secretary for Management Systems or to a position of equivalent grade, salary, tenure and qualifications. Decision on the Appeal of A. Ernest Fitzgerald, Sept. 18, 1973 at 20.

On December 3, 1973, the Air Force appointed Fitzgerald Deputy for Productivity Management in the office of the Assistant Secretary of the Air Force for Financial Management. Fitzgerald appealed to the CSC, claiming his new position violated the specific terms of the CSC decision of September 1973. The CSC upheld the Air Force decision to appoint Fitzgerald Deputy for Productivity Management. In the Matter of A. Ernest Fitzgerald, CSC Board of Appeals & Review, April 28, 1974. Fitzgerald filed an action in 1974, seeking review of the CSC's determination. *Fitzgerald v. Civil Service Commission*, C.A. NO. 74–686 (D.D.C. July 15, 1974), *reconsideration denied*, 383 F.Supp. 823 (D.D.C.1974). In response to a discovery motion in that case, the court, having before it the complete administrative record, decided to remand the case to the CSC "with direction to hold further hearings in accord with this order." *Id.*, slip op. at 10. The CSC conducted further hearings and again upheld the Air Force's decision to appoint Fitzgerald Deputy for Productivity Management. Decision on the Appeal of A. Ernest Fitzgerald, June 18, 1976. Fitzgerald filed the present action to seek review of the CSC's 1976 determination.

On March 3, 1981, the court found that the CSC's failure to find that Fitzgerald had actually suffered a reduction in rank was arbitrary and capricious. The court directed the Air Force to reinstate Fitzgerald to his prior position or to a position of equivalent status, and to submit to the court, no later than 30 days from the date of the order, the official job description for any position proposed for the plaintiff. Memorandum and Order, March 3, 1981 at 22.

---

1. For a more detailed discussion of the circumstances surrounding Fitzgerald's dismissal, *see Fitzgerald v. Staats*, 578 F.2d 435 (D.C.Cir.), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 616, 58 L.Ed.2d 680 (1978) (rejecting plaintiff's request for interest on backpay award).

During the course of this litigation, documents absent from the administrative record came to the attention of counsel and the court. On January 10, 1978, Fitzgerald filed a request for production of these documents, and a motion for the entry of an order to prevent their destruction. In subsequent pleadings, Fitzgerald alleged that the withholding of the documents was deliberate; and sought sanctions, costs, and attorney's fees against the Air Force, Air Force counsel, and the CSC. Plaintiff's Third Supplemental Response to Defendants' Opposition to Plaintiff's Motion to Strike at 19. Fitzgerald also requested costs and attorney's fees "for all prior litigation" because of "vexatious and harassing" government conduct. *Id.* at 20.

In its March 3, 1981 order, the court stayed Plaintiff's Request for Production of Documents and Plaintiff's Motion for Entry of an Order to Prevent Destruction of Documents pending submission of supplemental briefs on the question of sanctions and the award of costs and attorney's fees. Memorandum and Order, March 3, 1981 at 22.[2] After review of the submitted briefs, the court concludes that Air Force officials' bad faith flouting of a clear CSC mandate to restore Fitzgerald to an equivalent position

warrants an award of attorney's fees to Fitzgerald.[3] As the following discussion indicates, the conduct warranting an attorney's fees award was that of Air Force officials, not of individual Air Force counsel or the CSC,[4] so that the award granted in this case is against the Air Force alone. *See* 28 U.S.C. § 2412(c)(2).

## II. JURISDICTION FOR A FEE AWARD

■ Until October 1, 1981, 28 U.S.C. § 2412 prohibited the imposition of expenses and attorney's fees upon the United States, except as authorized by other statutes. The Equal Access to Justice Act, Pub.L.No. 96–481, Title II, § 204(a), 94 Stat. 2327 (October 21, 1980), amended § 2412 to authorize recovery of expenses and attorney's fees from the United States in certain circumstances. This amendment affects civil actions and adversary adjudications which were pending on, or commenced on or after October 1, 1981.

As of October 1, 1981, the court had not entered a final judgment in this case.[5] The March 3, 1981 order contemplated a subsequent ruling on the sufficiency of the pro-

---

**2.** Although plaintiff's request for these documents was stayed, the court had access to these documents and relied upon them in its March 3, 1981 order.

**3.** As the court's analysis demonstrates, the court bases its decision on Air Force officials' bad faith failure to comply with the September 18, 1973 CSC order. Although the Air Force's disregard of the mandate to restore Fitzgerald to an equivalent position is evidenced by documents absent from the administrative record, the court rejects Fitzgerald's argument that the failure of the Air Force and the CSC to produce particular documents at the CSC hearings itself warrants sanctions.

There is no evidence in the record that CSC officials purposely failed to forward the Meyer memoranda in response to Fitzgerald's July 23, 1974 document request to the Air Force and the CSC. It is unclear whether Fitzgerald asks also for sanctions for the improper withholding of the documents filed as exhibits to Plaintiff's Third Supplemental Response to Defendants' Opposition to Plaintiff's Motion to Strike. Many of these documents are not responsive to Fitzgerald's document request because they pre-date or deal with events before Fitzgerald's

December 1973 appointment as Deputy for Productivity Management, or because they post-date the June 1976 CSC decision reviewed in this case. Yet another document is attorney work-product. There is no evidence that the one relevant document, the Brayles memorandum addressed to Mr. Shrouls, was improperly withheld.

Since there is no evidence of deliberate withholding of documents from the CSC hearing, the court need not consider whether it has the authority to impose the sanctions Fitzgerald requests.

**4.** Accordingly, the court need not determine whether there is any merit in the defendants' argument that no sanctions may lie against the CSC because it no longer exists. Defendants' Reply Memorandum, April 7, 1981 at 7 n.6.

**5.** Although defendants appealed this court's March 3, 1981 order, *see Hampton v. Fitzgerald*, No. 81–1492 (D.C.Cir., filed May 5, 1981), defendants subsequently conceded the interlocutory nature of that order and voluntarily dismissed their appeal.

posed job description submitted by the Air Force. In addition, the March 3 order stayed Plaintiff's Request for Production of Documents and Plaintiff's Motion for Entry of an Order to Prevent Destruction of Documents pending the submission of additional briefs. Accordingly, this action was pending on October 1, 1981 and the court may award § 2412 attorney's fees, where appropriate, for services rendered throughout the course of the litigation. *Photo Data, Inc. v. Sawyer*, 533 F.Supp. 348 (D.D. C.1982), *excerpted in* 50 U.S.L.W. 2501 (1982) and cases cited therein at n.5.

## III. THE BAD FAITH STANDARD FOR A FEE AWARD

The Equal Access to Justice Act permits attorney's fees awards in actions against the United States in two different circumstances. Section 2412(b) renders the United States liable for attorney's fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." [6] Section 2412(d) renders the United States liable for attorney's fees "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." [7] Since Fitzgerald has not applied for § 2412(d) fees, this court may consider only whether the United States is liable to Fitzgerald under 28 U.S.C. § 2412(b). [8]

**6.** 28 U.S.C. § 2412(b) states:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency and any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

**7.** 28 U.S.C. § 2412(d)(1)(A) states:

■ The general "American rule" bars prevailing litigants from recovering attorney's fees from the losing party. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1974). There are four exceptions to this rule. Attorney's fees may be recovered when specifically authorized by statute or contract; when a party has conferred a common benefit by recovering a fund or property; when a party has willfully disobeyed a court order; and when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 257–59, 95 S.Ct. at 1621–23. 28 U.S.C. § 2412(b) was enacted so that the United States would no longer be exempt from an attorney's fee award in these four situations. H.R.Rep.No. 1418, 96th Cong., 2d Sess. 9 (1980), *reprinted in* [1980] U.S.Code Cong. & Ad.News 4984, 4987.

■ Usually the "bad faith" exception to the "American rule" is triggered by conduct which occurs during the course of the litigation and constitutes "insult added to injury." *See, e.g., Adams v. Carlson*, 521 F.2d 168 (7th Cir. 1975); *Townsend v. Edelman*, 518 F.2d 116 (7th Cir. 1975); *Lichtenstein v. Lichtenstein*, 481 F.2d 682 (3d Cir. 1973), *cert. denied*, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974); *Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). In a few cases the award has been for activity which formed the basis for the suit. *See,*

Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort) brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

**8.** Section 2412(d) mandates that a party seeking attorney's fees on the grounds that the government's position was not substantially justified submit an application in conformity with the requirements of § 2412(d)(1)(B). Section 2412(b) contains no such requirement.

*e.g., Rolax v. Atlantic Coast Line R. Co.,* 186 F.2d 473 (4th Cir. 1951); *Schlein v. Smith,* 160 F.2d 22 (D.C.Cir.1947). And in some instances awards have been made for vexatious conduct which occurred before litigation actually commenced. *See, e.g., Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Fairley v. Patterson,* 493 F.2d 598, 606 (5th Cir. 1974); *Sims v. Amos,* 340 F.Supp. 691 (M.D.Ala.), *aff'd summarily,* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972).[9]

Prelitigation conduct provides the basis for an award of attorney's fees when a party, confronted with a clear statutory or judicially-imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights. In *Vaughan v. Atkinson,* the seminal case allowing recovery of fees for prelitigation vexation, a seaman was hospitalized for tuberculosis shortly after he stopped working on the respondent shipowner's vessel. Although the seaman forwarded his hospital record to the shipowner, the owner's only investigation of the seaman's claim for maintenance and cure was an interrogation of the vessel's Master and Chief Engineer. The owner did not conduct any further investigation and did not bother even to admit or deny the validity of the seaman's claim. Although the seaman suffered no damages from the owner's failure to pay maintenance until ordered to do so by the court, the Court allowed attorney's fees because:

> In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it.

As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old.... It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one. [369 U.S. at 531, 82 S.Ct. at 99]

Courts have extended the *Vaughan* principle to nonadmiralty cases which present many different factual situations.[10] The most common extension has occurred in suits which charge that a policy of a large governmental institution, such as a school system or a prison, violates the constitutional rights of a number of citizens. In those cases courts have awarded attorney's fees when the institution, in clear default of constitutional duty, contested liability or submitted compliance plans which could not meet judicial guidelines. *E.g., Fairley v. Patterson; Bradley v. School Board,* 53 F.R.D. 28 (E.D.Va.1971), *rev'd on other grounds,* 472 F.2d 318 (4th Cir. 1972), *vacated on other grounds,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Gates v. Collier,* 371 F.Supp. 1368 (N.D.Miss.1973); *Sims v. Amos. See also Red School House, Inc. v. Office of Economic Opportunity,* 386 F.Supp. 1177 (D.Minn.1974).

The *Vaughan* principle has also been applied to suits involving individual plaintiffs forced to sue to redress injury unique to the individual. In *Burnaman v. Bay City Independent School District,* 445 F.Supp. 927 (S.D.Texas 1978), a teacher, entitled by regulation to an annual evaluation performed on the basis of "definite, objective standards," *id.* at 929, was notified that his contract would not be renewed because of an evaluation which the court characterized as "inaccurate, non-factual, not objective,

---

**9.** This categorization was set out in *Straub v. Vaisman & Co., Inc.,* 540 F.2d 591, 600 (3d Cir. 1976).

**10.** *E.g., F. Rich Co. v. Industrial Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Bond v. Stanton,* 528 F.2d 688 (7th Cir.), *vacated on other grounds,* 429 U.S. 973, 97 S.Ct. 479, 50 L.Ed.2d 581 (1976), *on remand,* 555 F.2d 172

(7th Cir. 1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53 (3d Cir. 1976) (en banc).

The court subscribes to the view expressed in *Skehan* that *Vaughan's* applicability to nonadmiralty cases survives *Alyeska. Skehan,* 538 F.2d at 57–58.

grossly unfair and not prepared in compliance with ... '[p]olicies' relating to evaluations." *Id.* at 930. The court found that the evaluation contained false and inaccurate information which the defendants knew or should have known was false and inaccurate. The court held that the teacher was entitled to compensatory and punitive damages for wrongful termination of his employment, and also awarded attorney's fees because the litigation was compelled in part by the defendants' bad faith conduct of the evaluation.

## IV. THE BAD FAITH IN THIS CASE

■ Defendants' conduct in this case includes the types of vexatious and obstructive actions described in *Vaughan*, in *Bradley*, and in *Burnaman*. When this suit began, Air Force officials were under an unambiguous CSC order to "restore [Fitzgerald] retroactively ... to the position from which he was improperly separated, or to any other position of like grade, salary and tenure in the Excepted Service and with the same or similar qualifications requirements as his former position." Decision on the Appeal of A. Ernest Fitzgerald, Sept. 18, 1973 at 20. At the time of that decree, according to William W. Woodruff, Assistant Secretary of the Air Force for Financial Management, it would have been possible to place Fitzgerald in the identical position that he had had prior to the alleged reduction-in-force. Deposition testimony of William W. Woodruff in *Fitzgerald v. Butterfield*, C.A. No. 74–178 (D.D.C., filed January 25, 1974), reproduced in Plaintiff's Third Supplemental Response to Defendants' Opposition to Motion to Strike, Exhibit 2 at 160 ("Woodruff deposition"), Record, Vol. IV at 467–82. Woodruff, without comparing Fitzgerald's responsibilities in the old and new jobs, made a recommendation to Secretary of the Air Force McLucas that Fitzgerald be assigned to the newly-created GS–17 position of Deputy for Productivity Management ("DPM"), outside the area of major weapons systems acquisitions.

Thomas Moran, the Principal Deputy Assistant Secretary for Financial Management who wrote Fitzgerald's new job description, had no first-hand knowledge of Fitzgerald's actual work in his old position, *id.* at 168–79; had never talked to Fitzgerald about his old job assignments, *id.* at 184–85; and had made no written comparison of the old and new jobs, *id.* at 191–202.

This conduct by Air Force officials assigned to prepare Fitzgerald's job assignment was not mere bureaucratic oversight. Contemporaneous notes of Air Force officials' meetings, as well as subsequent deposition testimony, show that the real reason Fitzgerald was assigned a new position was that Air Force officials felt that "clouds" hanging over Fitzgerald required that they try to "start [Fitzgerald] on a new slate". Woodruff deposition at 59. Indeed, Air Force officials told Fitzgerald that he would not have "any major involvement in major weapons systems until [he had] convinced Moran [and] Woodruff and most of all John [McLucas] that [he] intended to be a 'good' Air Force employee." Memorandum and Order, March 3, 1981 at 5. While the CSC order did not preclude assignment of Fitzgerald to a new equivalent position, the findings underlying that order clearly prohibited the Air Force from conditioning Fitzgerald's assignments upon "good behavior" as determined by the very officials who had attempted to remove Fitzgerald from the Air Force in the first place.

Although Air Force officials did not themselves seek to compare Fitzgerald's old and new positions, they did take extraordinary steps to insure that the CSC would approve their actions. Before formally appointing Fitzgerald to the DPM position, Air Force officials wrote to the Bureau of Executive Manpower of the CSC requesting approval of the appointment, and seeking concurrence that the appointment would satisfy the CSC's September 1973 decision. Record, Vol. I at 120. The Bureau of Executive Manpower certified the proposed DPM position as GS–17 and determined

that plaintiff was qualified for the position. The Bureau refused, however, to concur that the position satisfied the September 1973 order on the grounds that such a determination fell within the jurisdiction of the CSC's Appeals Examining Office, if and when plaintiff appealed his appointment. *Id.* at 149.

Rebuffed by the CSC's refusal to render an advisory opinion, Air Force officials resorted to more unconventional tactics to gain CSC approval of their plan. A memo to the file written by CSC employee Thomas H. Meyer on October 25, 1973 reveals that on October 23, 1973, Eldin McColl, an aide to the Secretary of the Air Force, contacted Meyer and "asked for a reaction . . . whether the proposed submission satisfies the Air Force's obligations to Fitzgerald." Plaintiff's Second Supplemental Response to Defendants' Opposition to Plaintiff's Motion to Strike, Exhibit B. Meyer's appraisal, contained in the memo to the file, was that "the job is somewhat weak for a GS–17 and should probably be reevaluated if vacated by Fitzgerald." Meyer nevertheless told McColl that the CSC would likely seek GS–17 as the grade for the position proposed. *Id.*

A second Meyer memorandum, dated October 26, 1973, shows that on that date, McColl himself contacted Meyer and informed him that Secretary McLucas had made a firm decision to locate Fitzgerald in the proposed DPM position; that the Secretary wanted to expedite the case as much as possible; and that the Secretary wanted "a specific response from [the CSC] to the effect that this position satisfies the CSC's verdict resulting from Fitzgerald's appeal." *Id.* at Exhibit C. Meyer contacted Herman Staiman, the hearing officer on the Fitzgerald case, to see whether Staiman might furnish an advance determination concerning the job description proposed for Fitzgerald. Staiman replied that although "[h]e would prefer not to have a specific letter sent to [the Air Force] in advance certifying that the criteria of the appeal

verdict are satisfied" "he [Staiman] would accept . . . [the CSC Bureau of Executive Manpower] determ[ination] that the job is worth the grade." *Id.* When McColl was advised of the CSC position, he said that Secretary McLucas would "no doubt call [Civil Service Commissioner] Hampton at first indication we won't deliver the statement in question." *Id.*

As this court said in its March 3, 1981 opinion, "[t]his *sub rosa* heavy-handedness, replete with threats to have the Secretary of the Air Force contact the Commissioner, can only indicate grave doubts among Air Force officials about the equivalency of the positions." Memorandum and Order, March 3, 1981 at 19. The fact that the *sub rosa* contacts were accompanied by the Air Force officials' failure to compare for themselves Fitzgerald's old and new positions demonstrates that the Air Force officials purposely flouted the mandate of the CSC order. Air Force officials admitted as much when they spoke to Fitzgerald and others about "clouds" hanging over Fitzgerald; about starting Fitzgerald on a "new slate"; and about conditioning Fitzgerald's involvement in major weapons systems upon Fitzgerald's demonstration that he intended to be a "good" Air Force employee.

Air Force officials' conduct was hardly different from the conduct of the defendants in *Bradley* and *Burnaman*. Charged with a clear legal duty to write a job description which would place Fitzgerald in an equivalent job, Air Force officials, like the school board officials in *Burnaman*, failed to employ procedures which would result in an objectively fair determination. Consequently, the plan they submitted, like the desegregation plans submitted by the Richmond school board in *Bradley*, had little realistic hope of complying with the order of the CSC or subsequently withstanding judicial scrutiny. Fitzgerald could not have achieved what was legally due him by complaining to and "negotiating" with the very same officials who had denied him his rights in the first place, and who had subse-

quently conditioned return of those rights upon Fitzgerald's "good behavior." Faced with Air Force officials' willful failure to adhere to the law, Fitzgerald was compelled to resort to litigation, first at the administrative level and then in this court, in order to vindicate his legal rights. Fitzgerald, as the prevailing party in this case, is entitled to recover his attorney's fees.

It is therefore, by the court, this 30th day of March, 1982,

ORDERED that plaintiff's request for reasonable attorney's fees is GRANTED; and

FURTHER ORDERED that the plaintiff within 30 days submit to this court an itemized statement from any attorney representing him or appearing in his behalf stating the actual time expended and the rate at which fees and other expenses are claimed; and

FURTHER ORDERED that plaintiff's motion for sanctions is DENIED.

### SETTLEMENT AGREEMENT

The parties, through their counsel, hereby stipulate and agree as follows:

1. The United States Air Force ("Air Force") shall assign A. Ernest Fitzgerald to the position of Management Systems Deputy to the Assistant Secretary of the Air Force (Financial Management) effective June 21, 1982. The job description for this position is attached as Exhibit 1 and incorporated into this Settlement Agreement.

2. The Air Force shall in good faith assign Fitzgerald tasks and work assignments commensurate with the position of Management Systems Deputy to the Assistant Secretary of the Air Force (Financial Management) and provide him with the appropriate resources to carry out these assignments. Fitzgerald shall in good faith perform the tasks assigned to him in this position.

3. Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, this action is dismissed with prejudice subject only to the jurisdiction of the Court to enforce the terms and conditions of this Agreement. Should any party to this Settlement Agreement believe that any other party or parties have violated any provision of the Agreement, that party may file a motion in Civil Action No. 76–1486 alleging violation of the Settlement Agreement and the Court shall entertain such application to determine its validity and whether relief is appropriate.

4. On February 6, 1984, the Air Force shall file a written report to this Court describing in detail the assignments given Fitzgerald in the position of Management Systems Deputy to the Assistant Secretary of the Air Force (Financial Management).

5. Simultaneously herewith the parties have filed a joint motion asking the Court to vacate the March 31, 1982, Memorandum and Order issued in this case. Whether this Court grants or denies this joint motion shall not affect the instant Settlement Agreement.

6. The Air Force shall pay to Fitzgerald's counsel on the date of the Court's approval of this Agreement the sum of $200,000 as attorneys' fees and costs for legal services provided plaintiff in this action. This payment shall constitute full satisfaction of any and all claims for attorneys' fees and costs, and plaintiff and his counsel hereby waive any and all claims against defendants for attorneys' fees and costs incurred in connection with these proceedings.

7. This Settlement Agreement does not constitute, and shall not be construed, as an admission of liability by the defendants nor as a concession by any party as to the correctness of any legal position or factual assertion advanced by any other party in this action.

JOHN BODNER, JR.

HOWREY & SIMON
1730 Pennsylvania Avenue
Washington, D.C. 20006
Tel: (202) 383-6899

R. LAWRENCE DESSEM

Attorney, Department of Justice
10th & Pennsylvania Ave., N.W.
Washington, D.C 20530
Tel: (202) 633-5108

**APPROVED**

UNITED STATES DISTRICT JUDGE          DATE          June 15, 1982

## EXHIBIT 1

## I. INTRODUCTION:

The incumbent of this position acts for and assists the Principal Deputy and Assistant Secretary for Financial Management as Management Systems Deputy with responsibility and authority necessary for the development of improved management controls and broader use of statistical analysis within the Air Force.

## II. DUTIES AND RESPONSIBILITIES:

1. The Management Systems Deputy is responsible at the highest Air Force level for policies and procedures regarding:

   (a) Integrated performance measurement, cost control and reduction

   (b) Economic cost effectiveness analysis

   (c) Management information and control systems

   (d) Productivity enhancement and measurement

   (e) Statistical programs and analysis.

   (f) Cost estimating and cost analysis.

2. Provides guidance and direction to the Air Staff and the Commands for the development and/or implementation of management information and control systems, resource management systems and associated data bases.

3. Formulates, establishes and implements policies and procedures for the Air Force productivity program including development of productivity enhancement goals and necessary reporting systems.

4. Responsible for Air Force integrated performance measurement including cost control and reduction activities. This responsibility includes supervision of Air Force performance measurement activities including cost/schedules control systems criteria (C/SCSC). Responsible for development of new systems and improvements of current systems for cost control and cost reduction, for application of "should cost" and related analyses and synthesis techniques to Air Force cost estimating, and for Air Force economic cost effectiveness analysis.

5. Performs or directs analyses and reviews of Air Force operational plans, mobilization plans, programs for foreign aid and other data, upon which financial requirements for resources are based, in order to develop or direct the development of effective management control systems.

6. Develops policies and procedures, and monitors the implementation of Air Force statistical programs including methods of analysis and presentation.

7. Serves as an advisor to the Assistant Secretary (Financial Management) while he is appearing before congressional committees. Serves on such committees and boards as specified by the Principal Deputy/Assistant Secretary.

8. Testifies before Congressional committees when requested.

9. Assures necessary program coordination between the Department of the Air Force, Department of Defense and other government agencies.

10. Accomplishes management studies and special projects as assigned by the Principal Deputy (Financial Management) or the Assistant Secretary (Financial Management).

Supervision Exercised: Incumbent is delegated necessary authority to carry out assigned duties and has authority to utilize resources, including manpower, as required to satisfactorily discharge the duties of his office.

## III. CONTROLS OVER WORK:

Reports to the Principal Deputy/Assistant Secretary (Financial Management). Supervision is limited normally to status reports furnished to the Principal Deputy/Assistant Secretary (Financial Management) for purposes of keeping them informed and/or for further guidance and direction. Accomplishes assigned duties and responsibilities with a high degree of individual initiative and creativity. Requires a high degree of professional stature.

## IV. OTHER SIGNIFICANT FACTS:

This position requires access to TOP SECRET information. Sensitive under paragraph 4b(2)(g), AFR 40–3. Incumbent has direct access to information and is authorized travel to visit Air Force field activities and contractors as necessary to perform duties described herein.